COPY

FILED

2014 NOV -7 PM 1: 24

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY:_____

Grant G. Teeple, Esq. SBN 144760
Gregory M. Garrison, Esq. SBN 165215
Frederick M. Reich, Esq. SBN 157028
TEEPLE HALL, LLP
9255 Towne Centre Drive, Suite 500
San Diego, CA 92121
Telephone:  (858) 622-7878
Facsimile:   (858) 622-0411
E-Mail:      grant@teeplehall.com
             greg@teeplehall.com
             fritz@teeplehall.com

Attorneys for Plaintiff DAVID L. FARLEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

ED CV14-02299

| | |
|---|---|
| DAVID L. FARLEY, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | 1) **Breach of Contract** |
| ANATOMIC HOLDINGS, INC., a | 2) **Accounting** |
| Delaware Corporation; | 3) **Declaratory Relief** |
| FXI INC., a Delaware Corporation; | |
| and DOES 1 -10 inclusive. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      This is an action brought by Plaintiff DAVID L. FARLEY ("Plaintiff" and/or "FARLEY") to compel an accounting to determine the amount he is owed under an Employment Agreement ("Agreement") with Defendants Anatomic Holdings, Inc. ("ANATOMIC") and FXI, Inc. ("FXI"), and, once ascertained, to recover the amount owed.  Under the Agreement, Defendants were required to pay Plaintiff "Earn Out Payments" calculated as a percentage of ANATOMIC'S income and Plaintiff was granted the right to audit Defendants' records to verify that he was paid all of the "Earn Out Payments" he was owed.  Defendants have failed and

1

Teeple Hall, LLP

refused to pay Plaintiff any "Earn Out Payments" or allow an audit.  Plaintiff hereby demands an audit and accounting and reserves his right to amend this Complaint to, among other things, assert a claim for fraud if it is determined that Defendants have concealed or misrepresented the amount Plaintiff is owed.

## THE PARTIES

2.     Plaintiff FARLEY is an individual and a resident of the State of California.

3.     Defendant ANATOMIC is a Delaware corporation.  Upon information and belief, ANATOMIC'S principal place of business is in Media, Pennsylvania.

4.     Defendant FXI is a Delaware corporation.   Upon information and belief, FXI'S principal place of business is in Media, Pennsylvania.   Upon information and belief, FXI is the sole stockholder in ANATOMIC.

5.     Defendants DOES 1-10, inclusive, are sued herein under fictitious names, since their true names and capacities are currently unknown to Plaintiff. When their true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities herein. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants has incurred liability to Plaintiff in relation to the transactions and/or occurrences which are the subject of this Complaint, is responsible in some manner for the occurrences herein alleged, and/or has an interest in the subject of this Complaint, and/or that the damages of Plaintiff herein alleged were proximately caused by such Defendant or Defendants.

6.     Plaintiff is informed and believes, and thereon alleges, that each of the Defendants herein was, at all times relevant to this action, the agent, employee, representing partner and/or joint venture of, and/or integrated enterprise with, the remaining Defendants, and was acting within the course and scope of said relationship in relation to the transactions and/or occurrences which are the subject of this Complaint. Plaintiff is further informed and believes, and thereon alleges,

Farley v. Anatomic, et al.                                    Case No.
Complaint

that each of the Defendants herein gave consent to, ratified, and authorized the acts of the remaining Defendants.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. Section 1332(a)(1), because the action is between citizens of different states, FARLEY demands non-monetary relief, and, upon information and belief, the amount in controversy, consisting of, *inter alia*, the amount FARLEY is owed by Defendants plus any punitive damages, exceeds $75,000.

8. The Court has jurisdiction over Defendants and venue is proper in this District under 28 U.S.C. Section 1391(b) because a substantial part of the events giving rise to the claims in this case occurred in this judicial district. Defendants ANATOMIC and FXI are also registered with the California Secretary of State for the purpose of doing business in California. Further, Defendants have consented to the jurisdiction of this Court and the parties have stipulated to have this dispute resolved in the Central District of California – Southern Division.

## STATEMENT OF FACTS

### The Employment Agreement

9. On or about May 27, 2011, FARLEY entered into an employment agreement (the "Agreement") with ANATOMIC and FXI. The Agreement defines "Company" to mean ANATOMIC and "Executive" to mean FARLEY. A true and correct copy of the Agreement is attached hereto as **Exhibit "A"**.

10. Agreement Article I, Section 1.1 (Employment) states: "Executive shall be employed as Chief Executive Officer of the Company, Chairman of the Board of Directors of the Company (the 'Board'), and shall report to the designee of the Chief Executive Officer of FXI (the 'FXI Manager')."

/ / /

/ / /

/ / /

11.     Agreement Article I, Section 1.3 (<u>Duties and Responsibilities</u>) provides: "During the Term, Executive shall have such duties and responsibilities and authorities commensurate with his position as Chairman and Chief Executive Officer of the Company and as may be assigned to Executive from time to time by the FXI Manager consistent with Executive's position.  It is the intention of the parties that Executive will be authorized to manage the day-to-day operations of the Company during the Term of the Agreement, within the authority limits defined within FXI's standard corporate policies generally applicable to its senior executives."

12.     Agreement Article II, Section 2.1(a) (<u>Term</u>) states: "The 'Initial Term' of Executive's employment under this Agreement shall commence on the date hereof (the 'Effective Date') and shall continue through the close of business on July 31, 2016 (the 'Scheduled Expiration Date'), unless sooner terminated in accord with Section 5 below."

13.     Agreement Article III, Section 3.1(c) (<u>Salary, Bonuses and Benefits</u>) states that, during the term, Plaintiff would be entitled to, *inter alia*, "Earn Out Payments".  The "Earn Out Payments" were to be a primary component of Plaintiff's compensation, and the promise thereof induced Plaintiff to enter into the Agreement.  The Agreement expressly contemplated that the "Earn Out Payments" could exceed the sum of ten million dollars ($10,000,000.00).

14.     Agreement Article III, Section 3.1(c) (<u>Salary, Bonuses and Benefits</u>) provides that the "Earn Out Payments" would be paid:

> for the five (5)-month period commencing on August 1, 2011 and ending on December 31, 2011, the four (4) immediately following successive twelve (12)-month periods (i.e., January 1, 2012 – December 31, 2012; January 1, 2013 – December 31, 2013; January 1, 2014 – December 31, 2014; and January 1, 2015 – December 31, 2015), and the seven (7)-month period commencing on January 1 2016 and ending on July 31, 2016 (such five (5)-year period, as may be extended pursuant to the terms of this Section, the "Earn-Out

4

Farley v. Anatomic, et al.                                                    Case No.
Complaint

Period", and each measurement period in the Earn-Out Period specified above, is a "Measurement Period")

15.     Agreement Article III, Section 3.1(c) (<u>Salary, Bonuses and Benefits</u>) provides that the amount of "Earn Out Payments" to which Plaintiff would be entitled would be calculated as a percentage of ANATOMIC'S "Operating Income", which term ("Operating Income") was defined in the Agreement, and in consideration of how ANATOMIC'S "Operating Income" compared to certain baseline amounts.

16.     Agreement Article III, Section 3.1(c) (<u>Salary, Bonuses and Benefits</u>) states: "Within 5 calendar days following each month's Board of Directors meeting of FXI Holdings, Inc., the Company shall provide to Executive a monthly profits and losses statement of the Company."

17.     Agreement Article III, Section 3.1(c) (<u>Salary, Bonuses and Benefits</u>) provides:

> Within 15 calendar days following the Company's finalization of its financial statements for each of the Measurement Periods (provided that   such financial statements shall be finalized no later than 45 days after the end of such Measurement Period), the Company shall prepare and deliver to the Executive a statement, in reasonable detail, setting forth the calculation of the Operating Income of the Company for the relevant Measurement   Period and the resulting Earn Out Payment for such Measurement Period (the "Earn Out Statement'"), together with a copy of the profits and losses statement of the Company for such Measurement Period. The Company's books and records and its profits and losses statements shall be maintained and prepared on an accrual basis in accordance with GAAP. **FXI shall permit the Executive or his agents access to the relevant books, records, facilities and employees of each FXI Company and the right to audit and examine such FXI Company's account and financial books and records to verify the Earn Out Statement**. All such examinations shall occur upon reasonable notice to FXI and shall take place at such FXI Company's office with the full cooperation of such FXI Company. If, as a result of such examination, the Executive determines that any sums are due, the Company shall immediately pay

5

the Executive the amount of such additional sums. In addition, if the amount of additional sums payable to the Executive is greater than five percent (5%) of the relevant period's Earn Out Payment as calculated by the Company, the Company shall reimburse the Executive for all reasonable costs of the Executive's audit and examination. Neither the Executive's acceptance of any information or the Executive's audit or examination of a FXI Company's records shall waive the Executive's right to dispute the accuracy or completeness of any information supplied by such FXI Company. (Emphasis added).

18.    Agreement Article III, Section 3.1(c) (<u>Salary, Bonuses and Benefits</u>) required Defendants to pay FARLEY his "Earn Out Payment" within "10 calendar days following the delivery of the Earn Out Statement for the applicable Measurement Period (but in no event later than March 15th of the year following the end of the applicable Measurement Period)".

19.    Agreement Article V, Section 5.1 (<u>Termination by the Company</u>) states: "The Company shall have the right to terminate Executive's (FARLEY'S) employment at any time with or without 'Cause', subject to the specific contractual obligations of the Company to Executive described herein."

20.    Agreement Article V, Section 5.5 (<u>Effect of Termination</u>) provides:

(b)    In the event of a termination of Executive's employment by Executive for Good Reason or by the Company for reasons other than for Cause, death or Disability, in addition to any Accrued/Other Obligations, Executive shall…be entitled to:

*    *    *    *

(ii)    payment of certain Earn Out Payments by the Company as follows:

| Month of Employment During Which Such Termination Occurs | Number of Years of Earn Out Payments Following Termination |
|---|---|
| First 18 | 3 |

Farley v. Anatomic, et al.                                          Case No.
Complaint

| 19-42 | 2 |
| --- | --- |
| 43 – July 31, 2016 | 1; provided that for any termination occurring on or after August 1, 2015 through and including July 31, 2016... |

The Earn Out Payments for each of the number of years to which Executive is entitled pursuant to the above shall be determined pursuant to Section 3.1(c) assuming for purposes of such calculation that the Company's Operating Income for each such year equals the average of (A) the Operating Income of the Company for the twelve (12) months immediately preceding the month in which such termination occurs and (B) the Operating Income of the Company for the twelve (12) month period commencing on the first day of the month in which such termination occurs (the "Subsequent 12 Month Period"). The Company shall calculate the amount of the Earn Out Payments payable to Executive under this Section within 15 calendar days following the Company's finalization of its financial statements which cover the Subsequent 12 Month Period (provided that such financial statements shall be finalized no later than 45 days after the end of such Subsequent 12 Month Period) and deliver an Earn Out Statement with respect thereto, and all Earn Out Payments under this Section 5.5(b)(ii) shall be paid…

**The Release**

21.     Defendants terminated FARLEY'S employment without cause, effective January 5, 2012.

22.     On or about March 8, 2012, FARLEY, ANATOMIC and FXI entered an agreement entitled Separation and Release Agreement (the "Release"). The Release defines "Company" to mean ANATOMIC and "Executive" to mean FARLEY. A true and correct copy of the Release is attached hereto as **Exhibit "B"**.

23.     Under the Release, FARLEY retains all of the rights to the Earn-Out Payments set forth in of the Agreement.  Release Section 2.1(a) states:

/ / /

Farley v. Anatomic, et al.                                          Case No.
Complaint

(a) <u>Earn-Out Payments</u>. Company shall promptly and without delay pay to Executive whatever Earn-Out Payments, if any, to which he is entitled under section 5.5(b)(ii) of the Employment Agreement, for the period of August 1, 2011 through December 31, 2014 (the "*Earn-Out Period*"), in accordance with the terms of such section. During the Earn-Out Period, within 5 calendar days following each month's Board of Director's meeting of FXI Holdings, Inc., the Company and FXI shall provide to Executive a monthly profit and loss statement of the Company, in the form of <u>Exhibit A</u> attached hereto. Company and FXI reaffirms [sic] that the procedures specified in Article 3.1(c) of the Employment Agreement shall be strictly followed…

## Defendants' Breaches

24.     ANATOMIC and FXI provided FARLEY with only cursory statements of ANATOMIC's "Operating Income" from June, 2011 to December, 2012.  On or about March 15, 2013, ANATOMIC ceased providing these cursory statements of ANATOMIC's "Operating Income" to FARLEY.  On April 15, 2013 an "Earn-Out Statement" for the year 2012 was also provided and there have been no further accounting records of any nature provided.

25.     On or about May 1, 2013 FARLEY retained a forensic accountant to audit the income statements previously provided to him under the Agreement. Through counsel, FARLEY contacted ANATOMIC and FXI requesting that they honor their contractual obligation under the Agreement, Article III, Section 3.1(c), to permit FARLEY and his agents "access to relevant books, records, facilities and employees of each FXI company and the right to audit and examine such FXI Company accounts and financial records to verify the Earn Out Statement" and to fully cooperate in connection with such examinations.

26.     ANATOMIC has represented to FARLEY that he is not entitled to any Earn Out Payments under the Agreement and Release.

/ / /

/ / /

Farley v. Anatomic, et al.                                                                    Case No.
Complaint

27.     Despite informing FARLEY that he is not entitled to any Earn Out Payments, Defendants refused to produce certain records requested by FARLEY's accountant.  FARLEY's accountant cannot provide an accurate audit of the Earn Out Statements without access to these records.

28.     FXI's counsel has represented that, on or about September of 2014, FXI closed ANATOMIC and transferred all of its assets, customer lists, and receivables to a new facility in Auburn, Indiana. This transfer of assets and relocation was done without FARLEY's knowledge or consent.  Upon information and belief, the new facility is a continuation of ANATOMIC and FXI's business subject to the Agreement and Release.

29.     FXI has refused to provide almost all of the information requested by FARLEY concerning the Auburn, Indiana facility, claiming that the requested information either is not available or is "too broad".

## FIRST CLAIM FOR RELIEF
## (BREACH OF CONTRACT)

30.     FARLEY incorporates by reference Paragraphs 1 to 29 of this Complaint as though fully set forth in this Cause of Action.

31.     On or about May 27, 2011, FARLEY, ANATOMIC and FXI entered into the Agreement, which is valid and enforceable against Defendants.

32.     On or about March 8, 2012, FARLEY, ANATOMIC and FXI entered into the Agreement, which is valid and enforceable against Defendants.

33.     FARLEY performed all of his obligations under the Agreement and Release that were not excused by Defendants' non-performance and/or unilateral termination of the Agreement.

34.     Upon information and belief, Defendants breached Sections 3.1(c) and 5.5(b)(ii) of the Agreement, as well as Section 2.1(a) of the Release, by failing to provide FARLEY with the Earn Out Payments to which he is entitled. To date, Defendants have failed to pay FARLEY any Earn Out Payments and have stated

Farley v. Anatomic, et al.
Complaint

Case No.

that he is not entitled to any Earn Out Payments.  FARLEY is informed and believes, and thereon alleges, that this is untrue and that he is owed Earn Out Payments under the Agreement and Release.  Said Earn Out Payments include, but are not limited to, those based upon sales out of the Auburn, Indiana facility.

35.   Defendants breached Section 3.1(c) of the Agreement by failing and refusing to provide FARLEY and his agents with "access to relevant books, records, facilities and employees of each FXI company and the right to audit and examine such FXI Company's account and financial books and records to verify the Earn Out Statement", despite FARLEY'S request for such an examination with reasonable notice, as set forth above.  Defendants have also breached their obligation under Section 3.1(c) by failing and refusing to allow said "examinations upon reasonable notice to FXI…" which "shall take place at FXI's company office with the full cooperation of such FXI Company."  Such breaches include, but are not limited to, Defendants' refusal to provide information related to the Auburn, Indiana facility.

36.   Defendants breached Section 3.1(c) of the Agreement and Section 2.1(a) of the Release through failing to provide FARLEY with profit and loss statements after December 2012.

37.   Defendants breached Section 3.1(c) of the Agreement through failing to provide FARLEY with statements "in reasonable detail, setting forth the calculation of the Operating Income of the Company for the relevant Measurement Period and the resulting Earn Out Payment for such Measurement Period".

38.   Upon information and belief, FARLEY has been damaged through not being paid the Earn Out Payments to which he is entitled under the Agreement and Release.  FARLEY is currently unable to ascertain the amount of Earn Out Payments which he is owed, and reserves the right to amend this Complaint to allege the amount of damages he is owed after an accounting has been performed.

Farley v. Anatomic, et al.                                                      Case No.
Complaint

WHEREFORE, FARLEY prays for judgment on this Cause of Action as follows:

1.     For an order that FARLEY is entitled to access the relevant books, records, facilities and employees of Defendants and has the right to audit and examine Defendants' account and financial books and records to verify the Earn Out Statements provided to FARLEY and the amount of Earn Out Payments he is owed, including, but not limited to, those of the Auburn, Indiana facility, and that Defendants are required to allow such an examination or examinations to take place at Defendants' offices, including, but not limited to, at the Auburn, Indiana facility, with the full cooperation of Defendants;

2.     For damages in an amount yet to be ascertained, consisting of, *inter alia*, any Earn Out Payments that FARLEY is owed, which are believed to be in excess of $75,000;

3.     For attorney fees to the extent allowable by contract or law;

4.     For costs of this suit;

5.     For a jury trial on all claims and issues so triable; and

6.     For such other and further relief as the Court may deem necessary or appropriate under the circumstances.

## SECOND CLAIM FOR RELIEF

## (ACCOUNTING)

39.     FARLEY incorporates by reference Paragraphs 1 to 38 of this Complaint as though fully set forth in this Cause of Action.

40.     Upon information and belief, there is an unascertained amount of Earn Out Payments owing that cannot be determined without an examination of Defendants' books and records to determine what is due and owing.

41.     The relationship between FARLEY and Defendants, as set forth in the Agreement and Release, as well as due to the trust and repose in Defendants to

Farley v. Anatomic, et al.                                    Case No.
Complaint

properly calculate and disclose the basis for the Earn Out Payments to FARLEY, is such that FARLEY is entitled to an accounting related to Defendants' Earn Out Statements, the amounts set forth therein, and the calculation thereof, as well as the amount he is owed as Earn Out Payments.

42.     The accounts related to the amount of Earn Out Payments to which FARLEY is entitled are sufficiently complicated that an ordinary legal action demanding a fixed sum is impracticable.

43.     Defendants have failed and refused to pay any Earn Out Payments to FARLEY and, further, have failed and refused to provide the documents necessary to audit and verify the amount of Earn Out Payments to which FARLEY is owed, including, but not limited to, information from the Auburn, Indiana facility.

WHEREFORE, FARLEY prays for judgment on this Cause of Action as follows:

1.      For an accounting related to Defendants' Earn Out Statements, the amounts set forth therein, and the calculation thereof, as well as the amounts FARLEY is owed as Earn Out Payments;

2.      For attorney fees to the extent allowable by contract or law;

3.      For costs of this suit;

4.      For a jury trial on all claims and issues so triable; and

5.      For such other and further relief as the Court may deem necessary or appropriate under the circumstances.

### THIRD CLAIM FOR RELIEF
### (DECLARATORY RELIEF)

44.     FARLEY incorporates by reference Paragraphs 1 to 43 of this Complaint as though fully set forth in this Cause of Action.

45.     An actual controversy has arisen and now exists between FARLEY, on the one hand, and ANATOMIC and FXI, on the other, regarding whether ANATOMIC and FXI are required to grant FARLEY access to the relevant books,

Farley v. Anatomic, et al.                                          Case No.
Complaint

Teeple Hall, LLP

records, facilities and employees of each and the right to audit and examine such account and financial books and records to verify the Earn Out Statements and amount of Earn Out Payments to which FARLEY is entitled. FARLEY desires a judicial determination of this issue.

46.     FARLEY also requests a determination that any transfer of the business from Corona, California to Auburn, Indiana is irrelevant to Defendants' obligation to pay FARLEY Earn Out Payments, account to FARLEY and allow FARLEY full access to materials necessary to audit whether FARLEY is entitled to Earn Out Payments under the Agreement and Release.

47.     A judicial declaration of the rights and obligations of the parties is necessary and appropriate in order for FARLEY to ascertain his rights under the Agreement and Release.

WHEREFORE, FARLEY prays for judgment on this Cause of Action as follows:

1.     For a declaration and order that FARLEY is entitled to access the relevant books, records, facilities and employees of Defendants and has the right to audit and examine Defendants' account and financial books and records to verify the Earn Out Statements provided to FARLEY and the amount of Earn Out Payments he is owed, including, but not limited to, those of the Auburn, Indiana facility, and that Defendants are required to allow such an examination or examinations to take place at Defendants' offices, including, but not limited to, at the Auburn, Indiana facility, with the full cooperation of Defendants;

2.     For a declaration and order that any transfer of the business from Corona, California to Auburn, Indiana is irrelevant to Defendants' obligation to pay FARLEY Earn Out Payments, account to FARLEY and allow FARLEY full access to materials necessary to audit

Farley v. Anatomic, et al.                                                   Case No.
Complaint

Teeple Hall, LLP

whether FARLEY is entitled to Earn Out Payments under the Agreement and Release;

3. For attorney fees to the extent allowable by contract or law;

4. For costs of this suit;

5. For a jury trial on all claims and issues so triable; and

6. For such other and further relief as the Court may deem necessary or appropriate under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff FARLEY prays for judgment and relief as follows:

1. For a declaration and order that FARLEY is entitled to access the relevant books, records, facilities and employees of Defendants and has the right to audit and examine Defendants' account and financial books and records to verify the Earn Out Statements provided to FARLEY and the amount of Earn Out Payments he is owed, including, but not limited to, those of the Auburn, Indiana facility, and that Defendants are required to allow such an examination or examinations to take place at Defendants' offices, including, but not limited to, at the Auburn, Indiana facility, with the full cooperation of Defendants;

2. For a declaration and order that any transfer of the business from Corona, California to Auburn, Indiana is irrelevant to Defendants' obligation to pay FARLEY Earn Out Payments, account to FARLEY and allow FARLEY full access to materials necessary to audit whether FARLEY is entitled to Earn Out Payments under the Agreement and Release;

3. For an accounting related to Defendants' Earn Out Statements, the amounts set forth therein, and the calculation thereof, as well as the amounts FARLEY is owed as Earn Out Payments;

4. For damages in an amount yet to be ascertained, consisting of, *inter*

Farley v. Anatomic, et al.
Complaint

Case No.

1    *alia*, any Earn Out Payments that FARLEY is owed, which are

2    believed to be in excess of $75,000;

3    5.    For attorney fees to the extent allowable by contract or law;

4    6.    For costs of this suit;

5    7.    For a jury trial on all claims and issues so triable; and

6    8.    For such other and further relief as the Court may deem necessary or

7          appropriate under the circumstances.

8    Dated:  November 7, 2014                    TEEPLE HALL, LLP

9

10                                       By: _____

11                                             Grant G. Teeple, Esq.
                                               Gregory M. Garrison, Esq.
                                               Frederick M. Reich, Esq.
12                                             Attorneys for Plaintiff
                                               DAVID L. FARLEY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

Farley v. Anatomic, et al.                    Case No.
Complaint

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all Claims for Relief and issues so triable.

Dated: November 7, 2014

TEEPLE HALL, LLP

By: _____

Grant G. Teeple, Esq.
Gregory M. Garrison, Esq.
Frederick M. Reich, Esq.
Attorneys for Plaintiff
DAVID L. FARLEY

16

Farley v. Anatomic, et al.
Complaint

Case No.

Teeple Hall, LLP

# Exhibit "A"

# Exhibit "A"

Execution Version

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is dated May 27, 2011, and is entered into by and among Anatomic Holdings, Inc., a Delaware corporation (the "Company"), FXI, Inc., a Delaware corporation formerly known as Foamex Innovations Operating Company ("FXI"), and David L. Farley ("Executive").

**WHEREAS**, the Company desires to employ Executive as its Chief Executive Officer and Chairman of the Board and Executive is willing to accept such employment in each case on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and promises contained herein and for other good and valuable consideration, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I.

### Employment, Duties and Responsibilities

1.1    Employment.  During the Term (as defined in Section 2.1 hereof), Executive shall be employed as Chief Executive Officer of the Company, Chairman of the Board of Directors of the Company (the "Board"), and shall report to the designee of the Chief Executive Officer of FXI (the "FXI Manager").  The Executive represents that he is entering into this Agreement voluntarily.

1.2    Devotion of Time to the Company.  During the Term, the Executive shall devote substantially all of his skill, knowledge and working time to the performance of the duties and responsibilities of his positions hereunder, except for vacation time and absence for sickness or similar disability.  Notwithstanding the foregoing, nothing shall preclude Executive from devoting a portion of his time and efforts (and retaining remuneration, if any, for such services) to (i) his personal and family affairs and investments, (ii) charitable, educational, civic and political activities, or (iii) service on the boards and advisory committees of other for-profit and not-for-profit entities, in each case so long as such activities in (i), (ii), or (iii) do not materially interfere with the performance of his duties hereunder; and further provided that with respect to serving on the board or advisory committee of any for-profit entity on which Executive is not serving as of the Effective Date, Executive shall have obtained the prior written consent of the FXI Manager, which consent shall not be unreasonably withheld.  The parties acknowledge and agree that Executive shall be permitted to continue to serve as a director or member of an advisory committee of each for-profit and not-for-profit entity on which Executive is serving as of the Effective Date, and further acknowledge and agree that Executive may be required to devote time to the wind-up and resolution of Anatomic Global, Inc. and matters arising therefrom.

1.3    Duties and Responsibilities.  During the Term, Executive shall have such duties, responsibilities and authorities commensurate with his position as Chairman and Chief Executive Officer of the Company and as may be assigned to Executive from time to time by the FXI Manager consistent with Executive's position.  It is the intention of the parties that Executive will be authorized to manage the day-to-day operations of the Company during the Term of the

Agreement. within the authority limits defined within FXI's standard corporate ~~policies generally~~ applicable to its senior executives.

## ARTICLE II.

### Term of Employment

2.1     Term.

(a)     The "Initial Term" of Executive's employment under this Agreement shall commence on the date hereof (the "Effective Date") and shall continue through the close of business on July 31, 2016 (the "Scheduled Expiration Date"), unless sooner terminated in accordance with Section 5 below.  Executive's employment hereunder shall be automatically extended on the terms and conditions set forth herein for successive one (1) year periods commencing on the Scheduled Expiration Date and each anniversary thereof, unless either party hereto gives written notice to the other party of its or his election not to so extend Executive's employment hereunder at least forty-five (45) days prior to the Scheduled Expiration Date or any anniversary thereof. The period during which Executive is employed pursuant to this Agreement (including the Initial Term and any extension thereof in accordance with this Section 2.1(a)) shall be referred to as the "Term."

(b)     Each of the Company and FXI represents and warrants to Executive that (i) the execution, delivery and performance of this Agreement by it has been fully and validly authorized by all necessary corporate action, (ii) this Agreement constitutes the legal, valid and binding agreement and obligation of such party, enforceable against it in accordance with the terms hereof, (iii) the officer signing this Agreement on its behalf is duly authorized to do so, (iv) the execution, delivery and performance of this Agreement or the Retention Agreement (as defined in Section 4.3(d)) does not violate any applicable law, regulation, order, judgment or decree or any agreement, plan or corporate governance document to which it or an affiliate is a party or by which it or an affiliate is bound, and (v) except as separately disclosed in writing by FXI to Executive on the date hereof, neither it nor any of its affiliates is a party to or is bound by any agreement, obligation, commitment, order, judgment or decree that restricts or reasonably could be expected to restrict the ability of the Company or FXI or its affiliates to operate, expand or otherwise modify the Anatomic Global business acquired from AGI (as defined in Section 3.1(c)(i)) as part of the Retention Agreement, including but not limited to the types of products to be manufactured, marketed or sold, the channels of distribution in which any such products are to be marketed or sold, and the customers or types of customers to which any such product is to be manufactured, marketed or sold.

## ARTICLE III.

### Compensation and Expenses

3.1     Salary, Bonuses and Benefits.  During the Term, Executive shall be entitled to the following:

(a)     Salary.  The Company shall pay Executive a base salary during the Term at a rate of Two Hundred Sixty Thousand Dollars ($260,000) per annum ("Base Salary"), payable in accordance with the normal payment procedures of the Company and subject to such

withholdings and other normal employee deductions as may be required by applicable law. The Compensation Committee of FXI Holdings, Inc. (the "Compensation Committee") shall review the Base Salary annually for increase (but not decrease), and may in its discretion increase the Base Salary or retain the then-current Base Salary following any such review. For purposes of this Agreement, after any increase to the Base Salary, the term "Base Salary" shall mean such increased amount.

(b)    Benefits.  Executive shall be eligible to participate in group medical, dental, vision, life and disability insurance, 401(K) plan, paid vacation and other benefits that are offered by the Company and in which other senior executives of the Company are eligible to participate from time to time, provided that such benefits are subject to the terms and conditions of such benefit plans/arrangements and comply with all regulations governing such plans. To the extent FXI permits employees of the Company to participate in the benefit programs of FXI after the Effective Date, Executive shall be eligible to participate in any such benefit programs and to the extent Executive elects to participate in such FXI benefit programs, Executive shall no longer be eligible to participate in the Company's benefit programs upon the effective date of such transition.

(c)    Earn Out Payments.  Executive shall be entitled to the following additional payments (collectively, the "Earn Out Payments") for the five (5)-month period commencing on August 1, 2011 and ending on December 31, 2011, the four (4) immediately following successive twelve (12)-month periods (i.e., January 1, 2012 – December 31, 2012; January 1, 2013 – December 31, 2013; January 1, 2014 – December 31, 2014; and January 1, 2015 – December 31, 2015), and the seven (7)-month period commencing on January 1, 2016 and ending on July 31, 2016 (such five (5)-year period, as may be extended pursuant to the terms of this Section, the "Earn-Out Period", and each measurement period in the Earn-Out Period specified above, is a "Measurement Period"), as follows:

A cash payment for each Measurement Period equal to 35% of the Operating Income (as defined herein) of the Company for such Measurement Period which is in excess of the Baseline (as defined herein) for such Measurement Period; provided that for any Operating Income during a Measurement Period in excess of the Base Case for such Measurement Period (as identified and set forth on Exhibit A attached hereto) up to and including 20.00% above such Base Case (the "Upside Operating Income"), Executive shall be paid 45.00% of such Upside Operating Income; provided further that for any Operating Income during a Measurement Period in excess of 20.00% above the Base Case for such Measurement Period, Executive shall be paid 50.00% of such excess. For the avoidance of doubt, the maximum cumulative consideration for the Earn Out Payments calculated using the foregoing formula shall not exceed $10,000,000. In the event that Company's performance during the Earn-Out Period is such that Executive is entitled, on a cumulative basis, to Earn Out Payments totaling $10,000,000, following such attainment, Executive shall be entitled to the following payment for each Measurement Period (or portion thereof) remaining in the Earn-Out Period: a cash payment for such Measurement Period (or portion thereof) equal to 25% of the Company's Operating Income for such Measurement Period (or portion thereof) in excess of the Adjusted Baseline (as defined below).

For purposes of this Agreement, the term "Operating Income" shall mean gross profit of the Company less total selling, general & administrative expenses of the Company recognized and determined on an accrual basis utilizing United States generally accepted accounting

principles ("GAAP"). Notwithstanding the foregoing, Operating Income for a Measurement Period shall be adjusted as follows:

(i)     There shall be excluded any negative effect from any extraordinary or unusual non-recurring losses or expenses of the Company with respect to the retention of the collateral of Anatomic Global, Inc. ("AGI") by the Company, FXI and/or any FXI Company on the Effective Date, including without limitation any amounts paid as damages in connection with litigation resulting therefrom;

(ii)    There shall be excluded any negative effect arising from any obligation or liability assumed or paid by the Company, FXI, or any FXI Company pursuant to Article VI to the extent that any such obligation or liability by its terms arose or was incurred  on or prior to May 27, 2011. For the sake of clarity, (A) any obligation or liability relating to any agreement assumed by the Company pursuant to Article VI, which by its terms is incurred in accordance with GAAP, including any proper amortization thereof after May 27, 2011, shall be included within the calculation for determining Operating Income to the extent such expense is of a type and nature as mutually determined by the parties to be allocated to the Company for purposes of calculating Operating Income as set forth in the sentence immediately following clause (v) below, and (B) those amounts of Liabilities identified on Exhibit D for which the Company is entitled to reduce the Earn Out Payment shall not be included in the calculation of Operating Income regardless of when such Liabilities are incurred;

(iii)   Any liability or obligation which is paid or incurred by the Company pursuant to the terms of Section 6.4 and reduces the amount of any Earn Out Payment earned and payable to Executive hereunder pursuant to the terms of Section 6.4; and (B) the amount of any Earn Out Payment paid to Executive hereunder during such Measurement Period, each shall not be deducted from operating revenue in the determination of Operating Income;

(iv)    The revenues included in the determination of Operating Income shall include any amounts recovered by AGI in connection with or otherwise relating to the Sino Century/Sino Max litigation; and

(v)     There shall be excluded any negative effect resulting from the assumption by Anatomic Operations, Inc. ("Operations") of any amounts owed by AGI to FXI pursuant to that certain Amended and Restated Loan and Security Agreement, dated as of November 10, 2010, between AGI and FXI (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement") and the Debtor Documents (as defined in the Loan Agreement), excluding the Guaranty (as defined in the Loan Agreement) (collectively, the "Assumed Debt").

It is the parties' intention that the Company will be charged with certain sales and marketing expenses, provided that the nature of such expenses, as mutually agreed by the parties, shall determine whether the Company or Operations will be charged.  Furthermore, the parties shall determine the services and related cost for certain administrative and support services to be provided to the Company, all as mutually agreed upon by the parties hereto no later than August 1, 2011.

For purposes of this Agreement, the term "Baseline" shall mean $1,500,000 for any Measurement Period which is comprised of twelve (12) months, shall mean $625,000 for the Measurement Period of August 1, 2011 through and including December 31, 2011 (the "2011 Measurement Period"), and shall mean $875,000 for the Measurement Period of January 1, 2016 through and including July 31, 2016.

For purposes of this Agreement, the term "Adjusted Baseline" shall mean the Operating Income of the Company for the trailing twelve months at the time the Company's performance entitles Executive to cumulative Earn-Out Payments under this Section 3.1(c) of $10,000,000 (the "Cap"); provided that if the Cap is attained during a Measurement Period, the Adjusted Baseline used for calculating Executive's Earn-Out Payment for the remaining full and partial months in that Measurement Period shall be prorated by a fraction, the numerator of which is the number days left in such Measurement Period and the denominator of which is 365.

The Company agrees that it shall pay Executive a $100,000 advance against the Earn-Out Payments earned and payable to Executive under this Section, which advance shall be paid to Executive in twelve (12) substantially equal monthly installments commencing on June 1, 2011 and on the first day of the next eleven (11) calendar months thereafter. The Company shall be entitled to reduce (but not below zero) the Earn Out Payment for (a) the 2011 Measurement Period earned and payable to Executive pursuant this Section 3.1(c) for each dollar that the Company advances to Executive between June 1, 2011 and December 31, 2011 under this paragraph and (b) for the 2012 calendar year Measurement Period earned and payable to Executive pursuant to this Section 3.1(c) for each dollar that the Company advances to Executive between January 1, 2011 and May 31, 2011 under this paragraph. To the extent permissible by law, each such installment shall be considered a separate payment from each other installment.

Within 5 calendar days following each month's Board of Directors meeting of FXI Holdings, Inc., the Company shall provide to Executive a monthly profits and losses statement of the Company.

Within 15 calendar days following the Company's finalization of its financial statements for each of the Measurement Periods (provided that such financial statements shall be finalized no later than 45 days after the end of such Measurement Period), the Company shall prepare and deliver to the Executive a statement, in reasonable detail, setting forth the calculation of the Operating Income of the Company for the relevant Measurement Period and the resulting Earn Out Payment for such Measurement Period (the "Earn Out Statement"), together with a copy of the profits and losses statement of the Company for such Measurement Period. The Company's books and records and its profits and losses statements shall be maintained and prepared on an accrual basis in accordance with GAAP.

FXI shall permit the Executive or his agents access to the relevant books, records, facilities and employees of each FXI Company and the right to audit and examine such FXI Company's account and financial books and records to verify the Earn Out Statement. All such examinations shall occur upon reasonable notice to FXI and shall take place at such FXI Company's office with the full cooperation of such FXI Company. If, as a result of such examination, the Executive determines that any sums are due, the Company shall immediately pay the Executive the amount of such additional sums. In addition, if the amount of additional sums payable to the Executive is greater than five percent (5%) of the relevant period's Earn Out Payment as calculated by the Company, the Company shall reimburse the Executive for all

reasonable costs of the Executive's audit and examination.  Neither the Executive's acceptance of any information or the Executive's audit or examination of a FXI Company's records shall waive the Executive's right to dispute the accuracy or completeness of any information supplied by such FXI Company.

If there is any dispute between the Company and Executive with respect to the amount of the Earn Out Payment for any Measurement Period, the Company shall pay out the undisputed amount of such Earn Out Payment as provided below and shall pay out any remaining amounts within 10 calendar days of the resolution of such dispute.

Any Earn Out Payment due to Executive under this Section 3.1(c) shall be deemed earned by Executive as of the last day of the applicable Measurement Period.  Within 10 calendar days following the delivery of the Earn Out Statement for the applicable Measurement Period (but in no event later than March 15th of the year following the end of the applicable Measurement Period), the Company shall make a payment to Executive, by wire transfer of immediately available funds to such account as Executive shall designate in writing, in an amount equal to the Earn Out Payment for such Measurement Period, if any.

Except as otherwise provided in Section 6.4 and in this Section 3.1(c) with respect to the $100,000 advance, in no event shall the Company set-off, off-set or otherwise reduce any Earn Out Payment payable to Executive under this Section 3.1(c) by any amounts owed to FXI, the Company, any other FXI Company, or any third party by AGI or Executive.

(d)     Vacation.  Executive shall accrue paid vacation at the rate of four weeks per year, in accordance with Company's written policy, with a maximum accrued amount of twenty-five (25) days.

3.2     Expenses.

(a)     The Company will promptly and in the ordinary course reimburse Executive for reasonable business-related expenses incurred by him in connection with the performance of his duties hereunder during the Term, subject, however, to the Company's written policies relating to business-related expenses as in effect from time to time during the Term.

(b)     With regard to any provision that provides for reimbursement of costs and expenses or of in-kind benefits, except as permitted by Section 409A of the Internal Revenue Code, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (ii) the amount of expenses eligible for reimbursement or in-kind benefits to be provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year, provided that the foregoing clause (ii) shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Internal Revenue Code solely because such expenses are subject to a limit related to the period the arrangement is in effect, and (iii) such payments shall be made no later than the last day of the Executive's taxable year following the taxable year in which the expense is incurred.

6

## ARTICLE IV.

### Exclusivity, Etc.

4.1     <u>Exclusivity</u>.  Executive agrees that during the Term he will not engage in any other business activities, pursued for gain, profit or other pecuniary advantage, except as permitted in Sections 1.2 and 4.2.  Executive agrees that all of his activities as an employee of the Company shall be in substantial conformity with all policies, rules and regulations and directions of the Company and FXI not inconsistent with this Agreement.  To the extent of any conflict between the policies, rules and regulations of the Company, on the one hand, and FXI, on the other hand, FXI's policies, rules and regulations shall govern.

4.2     <u>Other Business Ventures</u>.  Executive agrees that during the Term, he will not own, directly or indirectly, any controlling or substantial stock or other beneficial interest in any business enterprise which is engaged in, or competitive with, any business engaged in by the Company or FXI as of the Effective Date.

4.3     <u>Confidentiality; Non-competition</u>.

(a)     Executive agrees that he will not, at any time during or after the Term, for any reason or purpose whatsoever, other than in the ordinary course of performing his duties for the Company, use, publish, remove, copy or disclose to any party any information obtained by the Executive through his past or future affiliation with the Company or any subsidiary or affiliate of FXI (including without limitation Anatomic Operations, Inc.) (each, an "FXI Company"), however documented (including oral disclosure), concerning the Company's or any FXI Company's business and affairs, including:  data, know-how, and ideas; past, current and planned research and development, customer, supplier and distributor lists, contracts, billing histories, current and anticipated customer, supplier or distributor requirements; price and cost information; market studies; business plans and methods; computer software and programs; plans and projections for business opportunities for new or developing business; historical financial statements; financial projections and budgets; historical and projected sales; capital spending budgets and plans; the names and backgrounds of key personnel; commissions and salaries paid to personnel; personnel training and techniques and materials; and any other information, however documented (including oral disclosure), that the Company or any FXI Company treats or designates as confidential or proprietary information or that is a trade secret within the meaning of applicable trade secret law, and notes, analyses, compilations, studies, summaries and other material prepared by or for the Company or any FXI Company, containing or based on, in whole or in part, any information included in material prepared by or for the Company or any FXI Company containing, or based on, in whole or in part, any information included in the foregoing (collectively, the "Confidential Information").

(b)     Notwithstanding the foregoing, Confidential Information shall not include information that (i) is in the public domain other than as a result of a breach of this Section 4.3, (ii) the Company authorizes Executive to disclose, (iii) is required to be produced by Executive under order of a court of competent jurisdiction or a valid administrative or congressional subpoena, or (iv) is reasonably necessary for Executive to satisfy his obligations set forth in this Agreement, or to file or amend his tax returns; <u>provided</u>, <u>however</u>, that (1) upon issuance of any such order or subpoena, Executive shall promptly notify the Company and shall provide the Company with an opportunity (if then available) to contest the propriety of such order or

7

subpoena or restrict or condition the disclosure of such Confidential Information (or to arrange for appropriate safeguards against any further disclosure by the court or administrative or other body seeking to compel disclosure of such Confidential Information), any of the forgoing in this proviso to be at the Company's expense, and (2) prior to any use or disclosure of any Confidential Information pursuant to subsection (iv) above, Executive will provide the Company with reasonable prior written notice of his intent to use or disclose such information. Nothing in this Section 4.3 shall preclude Executive from disclosure or use of the Confidential Information (A) if such disclosure or use is appropriate and in the ordinary course of carrying out his duties as an employee or consultant of the Company or (B) which was acquired by the Company or any FXI Company from AGI to the extent necessary to permit Executive to resolve and wind-up the business and affairs of AGI, provided that Executive shall promptly notify FXI of such disclosure or use.

       (c)    Executive agrees not to remove from the premises of the Company, except as a director or an officer of the Company in the performance of his duties for the Company and its affiliates or except as specifically permitted in writing by the Company, any document or other object containing or reflecting any such Confidential Information. Executive recognizes that all such documents and objects, whether developed by him or by someone else, will be the sole and exclusive property of the Company. Upon termination of his employment hereunder, Executive shall forthwith deliver to the Company all such Confidential Information, including without limitation all lists of customers, correspondence, accounts, records and any other documents or property made or held by him or under his control in relation to the business or affairs of the Company, and no copy of any such Confidential Information shall be retained by him; provided, however, that nothing herein shall prevent Executive from retaining (i) his papers and other materials of a personal nature, including, without limitation, photographs, correspondence, personal diaries, calendars, and phone books, (ii) information showing his compensation or relating to reimbursement of his business expenses, (iii) information that is necessary for tax purposes, and (iv) copies of plans, programs, policies and agreements relating to his employment, or termination thereof, with the Company and its affiliates. Nothing in this Section 4.3(c) shall preclude Executive from removing from the premises of the Company or retaining a copy of any Confidential Information which was acquired by the Company or any FXI Company from AGI to the extent necessary to permit Executive to resolve and wind-up the business and affairs of AGI, provided that Executive shall promptly notify FXI of such disclosure or use.

       (d)    The Executive acknowledges that the services to be rendered by Executive to the Company are a special and unique character. The Executive agrees that, in consideration of (1) his employment hereunder, (2) FXI's agreement to investment of a substantial sum of money in the Company, (3) FXI releasing the Executive from the Continuing Guaranty, dated May 18, 2010, issued by the Executive in favor of FXI, (4) FXI entering into that certain Retention of Collateral and Release Agreement, dated as of the date hereof, with Executive and AGI (the "Retention Agreement"), pursuant to which, among other things, Company (as assignee of FXI) acquired all or substantially all of the operating assets of AGI and acquired the goodwill of AGI, and (5) the Company's agreement to pay Executive severance hereunder in the event of termination pursuant to Section 5.5, during the period of his employment with the Company and for a period of three (3) years following the date of termination of the Executive's employment with the Company, Executive shall not:

8

(i)     directly or indirectly (whether for compensation or otherwise) engage in (as a principal, shareholder, member, partner, director, manager, officer, agent, employee, consultant or otherwise), have any ownership interest in, be financially involved in or furnish capital or debt to, or otherwise be connected to or associated with any Person that engages in any activities that are the same as, or in competition with, the Company ("Competitive Business"), except that the foregoing shall not prohibit Executive from owning solely as a passive investment up to five percent (5%) of any class of equity securities of a Competitive Business whose securities are publicly traded on a national securities exchange or which is registered under Section 12(g) of the Securities Exchange Act of 1934;

(ii)    solicit, employ, or retain as a consultant or independent contractor, or permit any affiliate of Executive to solicit for employment, employ or retain as a consultant or independent contractor, any Person who is employed by or retained as a consultant or independent contractor by the Company or FXI as of the Effective Date, or was employed by or rendered services to the Company or FXI within the twelve (12) months immediately preceding the Effective Date; or

(iii)   solicit, induce, encourage or attempt to influence any customer, consultant, independent contractor, vendor or supplier of the Company or FXI to cease to do, or reduce the amount of business done with the Company following the Effective Date.

"Person" means any individual corporation, partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or governmental authority.

Executive acknowledges that (y) as of the date hereof, Executive is the owner of all of the capital stock of AGI and, accordingly, is an "owner of a business entity" as such term is used in California Business and Professions Code Section 16601 and that the assets of AGI acquired by Company pursuant to the Retention Agreement constitute all or substantially all of the operating assets of AGI and the goodwill of AGI, and (b) Executive has given the agreements set forth in this Section 4.3(d) as part of the consideration for FXI to enter into the Retention Agreement.

(e)     In the event of any conflict between the provisions of this Section 4.3 and the provisions of any other Company agreement, plan, policy, program or arrangement, whether entered into before, on or after the date of this Agreement, the provisions of this Section 4.3 shall control, unless Executive has expressly agreed in writing that the conflicting provision will override or amend this Section 4.3.  Executive acknowledges and agrees that he is making these restrictive covenants in consideration of the Company entering into this Agreement.

(f)     Executive acknowledges that the restrictions contained in this Article 4, in view of the nature of the business in which the Company is engaged and the Executive's position with Company, are reasonable and necessary to protect the legitimate interests of the Company, and that any violation of those restrictions would result in irreparable injury to the Company. Executive, therefore, agrees that, in the event of his violation of any of those restrictions, the Company, shall be entitled to obtain from any court of competent jurisdictions:  (a) preliminary and permanent injunctive relief against Executive, without the necessity of posting a bond or proving actual damages; and (b) in addition to such injunctive relief, recovery of damages from Executive and an equitable accounting of all commissions, earnings, profits and other benefits arising from such violation.  The rights contained herein shall be cumulative and in addition to any other rights and remedies to which the Company may be entitled.

(g)     Executive agrees that if any portion of the foregoing covenants, or the application thereof, is construed to be invalid or unenforceable, the remainder of such covenant or covenants or the application thereof shall not be affected and shall remain in full force without regard to the invalid or unenforceable portions.  If any covenant is held to be unenforceable because of the geographic area covered, the duration thereof, the scope thereof or any other reason, Executive agrees that the Court making such determination shall reduce the geographic area or duration and/or limit the scope thereof to provide the Company with the maximum protection permitted by law, and the covenant shall then be enforceable in its reduced from.  If Executive violates any of the restrictions contained in Section 4.3(d), the period of such violation (from the commencement of any such violation until such time as such violation shall be cured or ceased by Executive) shall not count toward or be included in the restrictive periods contained in Section 4.3(d).

## ARTICLE V.

### Termination

5.1     Termination by the Company.  The Company shall have the right to terminate Executive's employment at any time, with or without "Cause," subject to the specific contractual obligations of the Company to Executive described herein.  For purposes of this Agreement, "Cause" shall mean (i) substantial and continued willful failure by Executive to perform his material duties hereunder which results, or could reasonably be expected to result, in material harm to the business or reputation of the Company, which failure is not cured (if curable) by Executive within thirty (30) days after written notice of such failure is delivered to Executive by the Company, (ii) gross misconduct relating to the performance of Executive's duties for the Company and its affiliates, including, without limitation, embezzlement, fraud or misappropriation of the Company's property, which misconduct is not cured (if curable) by Executive within thirty (30) days after written notice of such failure is delivered to Executive by the Company, (iii) the conviction of, or entry of a plea of guilty or *nolo contendere* to, a felony or other crime involving moral turpitude, or (iv) any material breach by Executive of any material obligation to the Company or any of its affiliates under this Agreement, which breach is not cured (if curable) by Executive within thirty (30) days after written notice of such failure is delivered to Executive by the Company. Anything herein to the contrary notwithstanding, Executive shall not be terminated for "Cause" within the meaning of clauses (i), (ii) or (iv) unless he receives written notice from the Company stating the basis for such termination.

5.2     Death.  In the event Executive dies during the Term, this Agreement shall automatically terminate.

5.3     Disability.  In the event that Executive shall suffer a Disability (as defined below), the Company or Executive shall have the right to terminate Executive's employment under this Agreement, such termination to be effective upon the giving of notice thereof to the other party in accordance with Section 7.4 hereof.  For purposes of this Agreement, the term "Disability" means Executive is receiving long-term disability benefits under the Company's or FXI's plan(s) or, if there is no such plan, a physical or mental condition which has prevented Executive from performing his material duties hereunder for a period of at least ninety (90) consecutive days in any 365 day period or 120 non-consecutive days within any 365 day period as determined by a medical doctor mutually agreeable to Executive and the Company.  If the parties cannot agree on

a medical doctor, Executive and the Company shall each choose a medical doctor, and the two medical doctors shall choose a third medical doctor, who shall be the approved "medical doctor" for this purpose.

    5.4    <u>Termination by Executive with or without Good Reason</u>.  Executive may terminate his employment hereunder at any time, with or without Good Reason; provided that any termination by Executive of his employment under this Agreement for Good Reason shall not be effective unless Executive has provided notice to the Company of the event giving rise to Good Reason no later than ninety (90) days after the date the event occurs or, if later, the date Executive learns (or should have learned) of such event.  Each of the following will constitute "Good Reason" for purposes of this Agreement, unless otherwise agreed to in writing by Executive:  (i) the failure to pay compensation required hereunder and such failure is not cured within fifteen (15) days after written notice of the same is received by the Company; (ii) Executive is required to move to a new location that is more than fifty (50) miles from the offices of the Company located in Corona, CA; (iii) any decrease in Executive's Base Salary; (iv) a material diminution in Executive's authority, duties or responsibilities; or (v) any material breach by the Company, or any of its affiliates, of any material obligation to Executive under this Agreement.  Notwithstanding the above, Good Reason shall not exist unless the Executive has notified the FXI Manager of the actions or failures to act giving rise to Good Reason, and such actions or failures, if capable of being cured, shall not have been cured by the Company within thirty (30) days of the receipt of such notice and Executive has terminated his employment within sixty (60) days after so notifying the FXI Manager.

    5.5    <u>Effect of Termination</u>.

    (a)    In the event of termination of Executive's employment for any reason, the Company shall pay or provide Executive (or his beneficiary or, if he has not selected a beneficiary, his estate, in the event of his death) within thirty (30) days of the date of termination of employment: (i) any Base Salary or other compensation earned but not paid to Executive prior to the effective date of such termination, (ii) any business expenses incurred before termination that remain unreimbursed, (iii) any accrued but unused vacation days, and (iv) any payments, benefits, or entitlements which are vested, fully and unconditionally earned or due pursuant to this Agreement or any Company or FXI plan, policy, program or arrangement or other agreement (clauses (i) through (iv), "Accrued/Other Obligations").

    (b)    In the event of a termination of Executive's employment by Executive for Good Reason or by the Company for reasons other than for Cause, death or Disability, in addition to any Accrued/Other Obligations, Executive shall, subject to the effectiveness of his execution of a release and waiver substantially in the form attached hereto as <u>Exhibit B</u>, be entitled to:

    (i)    continued receipt of salary payments for a period of fifty-two (52) weeks from the date of termination (the "Severance Period") of employment, payable by the Company in accordance with the Company's regular payroll practices.  The payment of the amounts described in this paragraph 5.5(b)(i) shall begin on the thirtieth (30th) day following the date of execution of the release and waiver in the form attached hereto as <u>Exhibit B</u> provided that such release and waiver has become irrevocable;

    (ii)    payment of certain Earn Out Payments by the Company as follows:

| Month of Employment During Which Such Termination Occurs | Number of Years of Earn Out Payments Following Termination |
| --- | --- |
| First 18 | 3 |
| 19-42 | 2 |
| 43 – July 31, 2016 | 1; provided that for any termination occurring on or after August 1, 2015 through and including July 31, 2016, the Earn Out Payment shall be multiplied by a fraction, the numerator of which is the number of full and partial months (with partial months expressed as a decimal) left in such 12-month period and the denominator of which is 12. |

The Earn Out Payments for each of the number of years to which Executive is entitled pursuant to the above shall be determined pursuant to Section 3.1(c) assuming for purposes of such calculation that the Company's Operating Income for each such year equals the average of (A) the Operating Income of the Company for the twelve (12) months immediately preceding the month in which such termination occurs and (B) the Operating Income of the Company for the twelve (12) month period commencing on the first day of the month in which such termination occurs (the "Subsequent 12 Month Period"). The Company shall calculate the amount of the Earn Out Payments payable to Executive under this Section within 15 calendar days following the Company's finalization of its financial statements which cover the Subsequent 12 Month Period (provided that such financial statements shall be finalized no later than 45 days after the end of such Subsequent 12 Month Period) and deliver an Earn Out Statement with respect thereto, and all Earn Out Payments payable under this Section 5.5(b)(ii) shall be paid, (y) unless otherwise elected by the Company pursuant to (z) below, in a lump sum within 10 calendar days following the delivery of said Earn Out Statement (but in no event later than March 15th of the year following the end of the Subsequent 12 Month Period) or (z) if elected by the Company, in the following manner: the first yearly payment shall be made within 10 calendar days following the delivery of said Earn Out Statement (but in no event later than March 15th of the year following the end of the Subsequent 12 Month Period) and each subsequent yearly payment shall be made on the respective anniversary of the end of the

Subsequent 12 Month Period, and the first and each subsequent yearly payment shall be treated as a separate payment for purposes of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), provided that if Company elects option (z) and any payments made pursuant to option (z) ("Option Z Payments") shall be subject to the additional tax and interest imposed pursuant to Section 409A of the Code (or any successor thereto) or any comparable provision of state law (collectively, the "Excise Tax"), then the Company or its successor shall pay to the Executive within 30 days after payment of each Option Z Payment (or, if earlier, when the Executive is required to remit the Excise Tax with respect to such Option Z Payment) an additional amount (the "Gross-Up Payment") determined in accordance with the following provisions.  The Gross-Up Payment shall be equal to the amount necessary so that the net amount retained by the Executive, after subtracting the Excise Tax and after also subtracting all federal, state or local income tax, FICA tax and Excise Tax on the Gross-Up Payment, shall be equal to the net amount the Executive would have retained if no Excise Tax had been imposed and no Gross-Up Payment had been made.  It is intended that the Executive shall not suffer any loss or expense resulting from the assessment of any Excise Tax or the Company's reimbursement of the Executive for any such Excise Tax.  For purpose of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay (i) federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made, and (ii) state and local income taxes at the highest marginal rates of taxation in the state and locality of the Executive's residence on the date of the Option Z Payment, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.  Notwithstanding the foregoing, in the event that the Executive earns and receives cumulative Earn Out Payments (calculated including all Earn Out Payments received by Executive during his employment and the amount of any Earn Out Payments paid to Executive under this Section 5.5(b)(ii)) at least equal to the Cap, no further Earn Out Payments in excess of such Cap shall be paid to him under this Section 5.5(b)(ii).

(iii)    Executive shall be entitled to elect medical and/or dental continuation coverage under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

(c)    In the event Executive's employment is terminated on account of death or Disability (as defined in Section 5.3 hereof), in addition to any Accrued/Other Obligations, Executive (or his beneficiary or, if he has not selected a beneficiary, his estate, in the event of his death) shall be entitled to:

13

(i)      payment of the Earn Out Payments by the Company for a period of one year following the date of termination of Executive's employment, determined using the actual Operating Income of the Company for such period; and

(ii)      Executive shall be entitled to elect medical and/or dental continuation coverage under the provisions of COBRA.

(d)      Notwithstanding anything in this Section 5.5 or 5.6 to the contrary, in the event that the Executive is deemed to be a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code to the extent necessary to avoid adverse tax consequences under Section 409A of the Code and Executive is not "disabled" within the meaning of Section 409A(a)(2)(C) of the Code as of the date of separation from service, no payments hereunder that are "deferred compensation" subject to Section 409A of the Code shall be paid to Executive prior to the date that is six (6) months after the date of the Executive's "separation from service" (as defined in Section 409A of the Code and any Treasury Regulations promulgated thereunder) or, if earlier, Executive's date of death. Following any applicable six (6) month delay, all such delayed payments will be paid in a single lump sum on the earliest permissible payment date.

5.6      Full Settlement; Payment Date. Except as specifically provided in this Agreement, Executive shall have no rights to compensation or benefits upon or after termination of employment except as may be specifically provided under the Company's and/or FXI's employee benefit plans. All payments due under Section 5.5(a)(iii) shall be made in accordance with the applicable plan, policy, program, arrangement or other agreement. To the extent permissible by law, each payment and each installment described in Sections 5.5 and 5.6 shall be considered a separate payment from each other payment or installment.

5.7      Obligations; Withholding.

(a)      The obligations of the Company under this Agreement shall not be affected by Executive's receipt of compensation and benefits from another employer in the event that Executive accepts new employment following the termination of his employment under this Agreement. Upon a breach by Executive of any of his obligations under Section 4.3, Executive shall no longer have any right to receive payments under Section 5.5(b).

(b)      All payments to Executive under this Agreement may be reduced by applicable withholding by federal, state or local law.

## ARTICLE VI.

### Covenants

6.1 Intentionally Omitted.

6.2 Termination and Indemnification of Other Personal Guaranties and Commitments. The Company covenants and agrees that it shall use its best efforts to have the personal guaranties, commitments and/or obligations delivered by Executive and listed on Exhibit C attached hereto (the "Third Party Guaranties") terminated and released in full in connection with the Company's assumption or full satisfaction and discharge of the liabilities and obligations to which each such Third Party Guaranty relates. In the event the Company is unable or fails to have any Third Party Guaranty terminated and released in full, the Company agrees to fully

14

indemnify, defend, and hold Executive and his heirs, executors, administrators, successors and assigns (collectively, the "Indemnified Parties") harmless from and against any and all claims, demands, losses, liabilities, damages or expenses, including, without limitation, interest, penalties and reasonable attorneys' fees incurred as a result thereof ("Damages"), resulting or arising from such Third Party Guaranty.

6.3 Support and Funding of the Company.  Each of the Company and FXI covenants and agrees that, during the Earn-Out Period, it shall, and shall cause its directors, officers and employees to:

6.3.1   Comply in all material respects with all applicable laws and regulations which are necessary for the Company's operation of its business (the "Business"), including without limitation, maintaining all facilities used in the Business and/or in manufacturing by Operations for the Business in material compliance with all such applicable laws and regulations;

6.3.2   Ensure that the Company has adequate capital and cash, marketing and other resources to meet its expenses and conduct its operations in accordance with the business and growth plan of the Company developed by Executive and approved by the FXI Manager;

6.3.3   Use diligent, consistent and good faith efforts to cause the Company to achieve Operating Income in excess of the Baseline (and, to the extent applicable, Adjusted Baseline); and

6.3.4   Ensure that the Assumed Debt has no negative effect upon the performance of the Company or the Executive's opportunity to fully achieve the Earn Out Payments.

6.4  Certain Obligations and Liabilities Reducing Earn Out Payments.  As specifically identified for each obligation and liability of AGI and/or Executive described on Exhibit D attached hereto (each, a "Liability" and together, the "Liabilities"), the Company hereby either (a) assumes such Liability as of the Effective Date and agrees to timely and fully pay, defend, satisfy, discharge and perform such Liability as and when due (and if already due as of the Effective Date, pay such Liability within five (5) business days of the Effective Date) or (b) agrees to otherwise timely and fully satisfy and discharge such Liability as and when due (and if already due as of the Effective Date, pay such Liability within five (5) business days of the Effective Date).  If either FXI or the Company receives from a third party any invoice or other demand relating to a Liability, such party shall give a copy thereof to Executive for review and approval (such approval not to be unreasonably withheld).  If Executive receives from a third party any invoice or other demand relating to a Liability, Executive shall review same and provide a copy to the Company, together with his approval or disapproval of such invoice or other demand.  To the extent that Executive does not approve any invoice or other demand, Executive and the Company shall cooperate in good faith and shall negotiate with the third party presenting such invoice or other demand to resolve any dispute, with the Company promptly paying the amount mutually agreed to resolve such dispute.  The parties agree that the Company shall be entitled to reduce (but not below zero) the Earn Out Payment earned and payable to Executive under Section 3.1(c) hereof for each dollar that the Company pays to a third party in connection with a Liability during such Measurement Period or over such number of

Measurement Periods as specified for such Liability on Exhibit D attached hereto; provided that to the extent that a specific dollar amount is not listed for any Liability identified on Exhibit D or the amount paid by the Company to the third party to which any such listed Liability is owed exceeds the amount specified on Exhibit D, the Company shall not be entitled to make such reduction unless and until the amount of such payment is reviewed and approved by Executive as provided above.

6.5 Other Obligations and Liabilities Not Reducing Earn Out Payments. As specifically identified for each obligation and liability of AGI and/or Executive described on Exhibit E attached hereto (each, an "Other Liability" and together, the "Other Liabilities"), the Company hereby either (a) assumes such Other Liability as of the Effective Date and agrees to timely and fully pay, defend, satisfy, discharge and perform such Other Liability as and when due (and if already due as of the Effective Date, pay such Other Liability within five (5) business days of the Effective Date) or (b) agrees to otherwise timely and fully satisfy and discharge such Other Liability as and when due (and if already due as of the Effective Date, pay such Other Liability within five (5) business days of the Effective Date). If FXI or the Company receives from a third party any invoice or other demand relating to an Other Liability, such party shall give a copy thereof to Executive for review and approval (such approval not to be unreasonably withheld). If Executive receives from a third party any invoice or other demand relating to an Other Liability, Executive shall review same and provide a copy to the Company, together with his approval or disapproval of such invoice or other demand. To the extent that Executive does not approve any invoice or other demand, Executive and the Company shall cooperate in good faith and shall negotiate with the third party presenting such invoice or other demand to resolve any dispute, with the Company promptly paying the amount mutually agreed to resolve such dispute. The parties agree that no dollar amount paid by the Company in connection with the Other Liabilities shall reduce any Earn Out Payment payable to Executive under Section 3.1(c) hereof. The Company shall assume no liabilities, obligations, or duties of Anatomic Global, Inc. except for the Liabilities and Other Liabilities, the contractual obligations relating to the contracts specifically listed on Exhibit E, and as otherwise set forth in this Agreement. Except for the foregoing and except for any other liability, obligation, or duty that the Company expressly agrees to pay or perform under other provisions of this Agreement, the Company shall not be liable for, and does not assume or agree to pay, perform, or discharge, any debt, claim, lien, obligation, duty, contract, agreement, tax, or other liability of any kind or nature, known or unknown, contingent or otherwise, related to Anatomic Global, Inc.

6.6 Pending Lawsuits. As of the Effective Date, the Company hereby (a) assumes the defense of, and agrees to timely and diligently defend Executive and AGI from and against, the pending and threatened lawsuits and claims identified on Exhibit F attached hereto (the "Cases"), (b) agrees to timely pay all costs and expenses (including without limitation attorneys' fees and expenses) incurred by Executive and AGI relating to the defense of such Cases prior to the Effective Date (to the extent unpaid on the Effective Date), and (c) agrees to timely pay, upon presentation of proper invoices, all costs and expenses (including without limitation attorneys' fees and expenses) as hereafter incurred in the ordinary course of the defense of such Cases; provided that Executive shall manage and oversee such Cases in his reasonable and good faith discretion in coordination with SVP, Legal of FXI; provided further that the Company may elect, but is not required, to pay any damages which are finally determined by a court of competent jurisdiction to be owed by Executive and/or AGI in any such Case or which are to be paid by

7.3     Benefit of Agreement; Assignment; Beneficiary.

(i)     This Agreement shall inure to the benefit of and be binding upon each party and its successors and assigns, including, without limitation, any corporation or person which may acquire all or substantially all of the Company's or FXI's, as the case may be, assets or business, or with or into which the Company or FXI, respectively, may be consolidated or merged. This Agreement shall also inure to the benefit of, and be enforceable by, Executive and his personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

(ii)     No rights or obligations of Executive hereunder may be assigned or transferred by Executive, without the prior written consent of the Company, except to the extent permitted under any applicable plan, policy, program, arrangement of, or other agreement with, the Company and/or FXI or its affiliates or by will or operation of law. No rights or obligations of the Company or FXI under this Agreement may be assigned, without the prior written consent of Executive, except that such rights may be, and such obligations shall be, assigned or transferred pursuant to a merger or consolidation in which the Company or FXI, respectively, is not the continuing entity or a sale or liquidation or other disposition of all or substantially all of the assets of the Company or FXI, provided that the assignee or transferee is the successor to all or substantially all of the assets of the Company or FXI, as the case may be, and assumes in writing the liabilities, obligations and duties of the Company or FXI, respectively, under this Agreement. For the avoidance of doubt, "Company" shall include any successor entity to the Company; provided, however, upon any change in control of the beneficial ownership of a majority of the issued and outstanding equity securities of the Company, if such successor, transferee or assignee conducts businesses which were not conducted by the Company immediately prior to such transaction ("Other Businesses"), references to the Company and its affiliates or subsidiaries in Article IV of this Agreement shall not include such Other Businesses nor shall any reference to employees, agents, customers or suppliers include a reference to an employee, agent, customer or supplier of such successor entity unless such employee, agent, customer or supplier was also an employee, agent, customer or supplier of the Company immediately prior to such transaction. Any action taken by FXI under this Agreement shall be deemed to be an action by the Company.

(iii)     If Executive should die while any amount, benefit or entitlement would still be payable (or due) to Executive hereunder if he had continued to live, all such amounts, benefits and entitlements shall be paid or provided in accordance with the terms of this Agreement to Executive's beneficiary, devisee, legatee or other designee, or if there is no such designee, to Executive's estate.

7.4     Notices. Any notice required or permitted hereunder shall be in writing and shall be sufficiently given if personally delivered, or if sent by registered or certified mail, postage prepaid, with return receipt requested, or by a nationally recognized overnight courier addressed: (a) in the case of the Company and/or FXI, to FXI, Attention: General Counsel at Rose Tree Corporate Center II, Media, PA 19063-2076, or to such other address and/or to the attention of such other person as the Company shall designate by written notice to Executive; and (b) in the case of Executive, to his then current home address as shown on the Company's records, or to such other address as Executive shall designate by written notice to the Company. Any notice

18

given hereunder shall be deemed to have been given at the time of receipt thereof by the person to whom such notice is given (which in the case of registered or certified mail or overnight courier, shall be the date acknowledgement of delivery is obtained by such service). Any notice given to Foamex Innovations, Inc. by Executive shall be deemed to be a notice to the Company for purposes of this Agreement.

      7.5    Entire Agreement; Amendment.  This Agreement shall be effective and binding on the parties as of the date first written above. Except as noted in this Agreement, this Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof, including, without limitation, the terms and conditions of Executive's employment during the Term, and supersedes any and all prior agreements and understandings, whether written or oral, between the parties hereto with respect to such subject matter. This Agreement may not be changed or modified except by an instrument in writing signed by all of the parties hereto, specifically referencing the provision being so changed or modified.

      7.6    Waiver.  The waiver by a party of a breach of any provision of this Agreement shall not operate or be construed as a continuing waiver or as a consent to or waiver of any subsequent breach hereof.

      7.7    Headings.  The Article and Section headings herein are for convenience of reference only do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

      7.8    Governing Law.  This Agreement shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of California without reference to the principles of conflict of laws.

      7.9    Agreement to Take Actions.  Each party hereto shall execute and deliver such documents, certificates, agreements and other instruments, and shall take such other actions (and use its best efforts to cause third parties referenced herein or any Exhibit hereto to take such other actions), as may be reasonably necessary or desirable in order to effectuate the purposes hereof (including without limitation (a) the purposes and intent of Article VI hereof and (b) the filing of a Form UCC-3 or similar statement in order to terminate any financing statement previously filed with respect to Executive in order to perfect or otherwise give public notice of any security interest which is to be terminated and released pursuant to Article VI hereof).

      7.10    Arbitration.  Except for disputes with respect to Section 4.1(b), 4.2 or Section 4.3 hereof, any dispute between the parties hereto respecting the meaning and intent of this Agreement or any of its terms and provisions (each, a "Covered Claim") shall be submitted to arbitration in Orange County, California, in accordance with the Commercial Rules of the American Arbitration Association then in effect, and the arbitration determination resulting from any such submission shall be final and binding upon the parties hereto. The Company shall be responsible for the costs of the arbitration, and each party will be responsible for his or its own legal fees and expenses in connection with any Covered Claim; provided that if Executive is the prevailing party in any Covered Claim, he shall be entitled to reimbursement for his reasonable attorneys' fees and expenses in connection therewith. Judgment upon any such arbitration award may be entered in any court of competent jurisdiction.

      7.11    Section 409A.  The parties agree that if any payment or the provision of any amount, benefit or entitlement hereunder at the time specified in this Agreement would subject

Executive to any additional tax or interest or penalties under Section 409A of the Internal Revenue Code of 1986, as amended and its implementing regulations or guidance ("Section 409A"), the payment or provision of such amount, benefit or entitlement shall be postponed to the earliest commencement date on which the payment or the provision of such amount, benefit or entitlement could be made without incurring such additional tax, interest or penalties (including paying any severance that is delayed in a lump sum upon the earliest possible payment date which is consistent with Section 409A). In addition, to the extent that any regulations or guidance issued under Section 409A (after application of the previous provision of this paragraph) would result in Executive being subject to the payment of interest, penalties or any additional tax under Section 409A, the parties agree, to the extent reasonably possible, to amend this Agreement in order to avoid the imposition of any such interest, penalties or additional tax under Section 409A, which amendment shall be reasonably determined in good faith by the Company and Executive.

7.12    Survivorship. The respective rights and obligations and representations and warranties of the parties hereunder shall survive any expiration or termination of the Term of this Agreement to the extent necessary to give effect to the intended preservation of such rights and obligations (including without limitation the survival of the following: Articles IV, V, VI, and VII, Sections 2.1(b) and 3.1(c)).

7.13    Validity. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision or provisions of this Agreement, which shall remain in full force and effect.

7.14    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument. Signatures delivered by facsimile shall be effective for all purposes.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed this Agreement effective as of the date first above written.

ANATOMIC HOLDINGS, INC.

By: _Harold J Earley_____

Name: Harold J Earley

Title: EVP & CFO

FXI, INC. (f/k/a Foamex Innovations Operating Company)

By: _Harold J Earley_____

Name: Harold J. Earley

Title: EVP & CFO

EXECUTIVE

_____

David L. Farley

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed this Agreement effective as of the date first above written.

ANATOMIC HOLDINGS, INC.

By: _____
    Name:
    Title:

FXI, INC. (f/k/a Foamex Innovations Operating Company)

By: _____
    Name:
    Title:

EXECUTIVE

_____
David L. Farley

### Exhibit A

### Earn Out Spreadsheet

| | 2011 (2) | 2012 | 2013 | 2014 | 2015 (2) | |
|---|---|---|---|---|---|---|
| Sales | $ 29,362 | $ 35,367 | $ 43,149 | $ 53,735 | $ 68,104 | |
| Foam Costs (1) | $ 13,037 | $ 15,703 | $ 19,158 | $ 23,858 | $ 30,238 | |
| Foam Costs % of Net Sales | 44% | 44% | 44% | 44% | 44% | |
| Other Manufacturing Costs | $ 7,408 | $ 8,792 | $ 10,572 | $ 13,846 | $ 17,523 | |
| Other Material Costs % of Net Sales | 25% | 25% | 25% | 26% | 26% | |
| Overhead | $ 1,421 | $ 1,556 | $ 1,608 | $ 1,638 | $ 1,671 | |
| Total Costs of Goods Sold | $ 21,866 | $ 26,051 | $ 31,338 | $ 39,342 | $ 49,432 | |
| Gross Profit | $ 7,496 | $ 9,316 | $ 11,811 | $ 14,393 | $ 18,672 | |
| Selling Expenses | $ 1,914 | $ 2,936 | $ 4,247 | $ 5,323 | $ 6,552 | |
| G&A Expenses | $ 2,488 | $ 3,123 | $ 3,385 | $ 3,586 | $ 3,773 | |
| Operating Income | $ 3,094 | $ 3,257 | $ 4,179 | $ 5,484 | $ 8,347 | |
| Base Line Operating Income | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | |
| | | | | | | **5yr Cumm Earnout** |
| Farley Earnout (Base Case) | $ 558 | $ 615 | $ 938 | $ 1,394 | $ 2,396 | $ 5,901 |

**Assume Operating Income Exceeds Base Case by 20%**

| | 2011 (2) | 2012 | 2013 | 2014 | 2015 (2) | |
|---|---|---|---|---|---|---|
| Upside Operating Income | $ 3,713 | $ 3,908 | $ 5,015 | $ 6,581 | $ 10,016 | |
| Farley Earnout (Upside) | $ 836 | $ 908 | $ 1,314 | $ 1,888 | $ 3,148 | $ 8,094 |

**Assume Operating Income Exceeds Base Case by 40%**

| | 2011 (2) | 2012 | 2013 | 2014 | 2015 (2) | |
|---|---|---|---|---|---|---|
| Upside Operating Income | $ 4,332 | $ 4,560 | $ 5,851 | $ 7,678 | $ 11,686 | |
| Farley Earnout (Upside) | $ 1,146 | $ 1,234 | $ 1,732 | $ 2,436 | $ 3,982 | $ 10,530 |

(1) Assumes a 14% overall reduction in material costs as % of Revenue vs. current run rate
(2) Amounts would be pro-rated pursuant to Section 3.1(c) of the Agreement.

| | |
|---|---|
| Base Earnout % | 35% |
| Upside Earnout% | 45% |
| Max Earnout % | 50% |

**Exhibit B**

**Release**

_____ ("Executive") has executed this release ("Release") as of the date set forth below.

WHEREAS, Executive's employment has been terminated by the Company without Cause or by the Executive for Good Reason pursuant to an employment agreement among Executive, Anatomic Holdings, Inc. (the "Company"), and FXI, Inc. ("FXI"), dated as of May ___, 2011 (the "Employment Agreement").

WHEREAS, Executive is entitled to certain payments and benefits under the Employment Agreement subject to his execution and delivery of this Release to the Company.

THEREFORE, Executive agrees as follows:

1.    Release of Claims.  In consideration for the severance payments by the Company as set forth in the Employment Agreement and other good and valuable consideration set forth herein, Executive hereby releases the Company, its shareholders, directors, officers, employees, agents, attorneys, affiliates, parents, subsidiaries, predecessors, successors, assigns, and all persons acting by, through, under or in concert with any of them (but with respect to any entity, individual, agent, attorney or their affiliates, including any one acting by, through, under or in concert with any of them, only in its or his official capacity relating to the Company and not in its or his individual capacity unrelated to the Company), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, and from any claims of any nature whatsoever, except for vested pension benefits under the Employment Retirement Income Security Act ("ERISA"), known or unknown, which Executive now has, claims to have, own, hold or which Executive at any time heretofore had, held, or claims to have, including without limitation, claims for: wrongful discharge; breach of covenant of good faith and fair dealing; intentional or negligent infliction of emotional distress; breach of contract or implied contract; negligence; misrepresentation; fraud; detrimental reliance; promissory estoppel; defamation; invasion of privacy; sexual harassment; breach of laws governing safety in the workplace; discrimination on the basis of sex, race, color, religion, age, national origin, status as a handicapped or disabled person or status of a non-citizen; any and all claims under the Age Discrimination in Employment Act ("ADEA"); any and all claims under Title VII of the Civil Rights Act of 1964; any and all claims under the Americans with Disabilities Act; any and all claims under state or local laws which prohibit improper discrimination; and any and all claims for benefits under the ERISA, except for all claims for vested pension benefits under ERISA. Notwithstanding the preceding sentence or any other provision of this Release, this Release is not intended to interfere with Executive's right to file a charge with the Equal Employment Opportunity Commission (the "EEOC") in connection with any claim he believes he may have against the Company.  However, by executing this Release, Executive hereby waives the right to recover in any proceeding Executive may bring before the EEOC or any state human rights commission or in any proceeding brought by the EEOC or any state human rights commission on Executive's behalf, ~~Notwithstanding the foregoing, Executive is not releasing any claims~~

23

hereunder with respect to (1) Executive's right to receive the Accrued/Other Obligations, (2) Executive's rights under, and/or the provisions of, Articles V, VI and VII, (3) any breach by the Company and/or FXI of Section 2.1(b) and/or 3.1(c) of the Employment Agreement, (4) Executive's right to be indemnified and advanced expenses pursuant to any corporate document of the Company (including without limitation the Employment Agreement) and/or FXI or applicable law or Executive's right to be covered under any applicable directors' and officers' liability insurance policies, (5) any rights as a shareholder of the Company or (6) any rights which arise after the date of this Release with respect to matters that occurred after such date.

     2.    <u>No Right to Re-employment</u>.  Executive hereby agrees and recognizes that his employment relationship with the Company or its affiliates is being permanently and irrevocably severed and that the Company has no obligation, contractual or otherwise, to rehire, re-employ, recall or to hire him in the future, or return him to active status.

     3.    <u>Additional Covenants and Acknowledgments</u>.  Executive further understands and agrees:

     a)    that by signing this Release he is voluntarily making a full and final compromise and settlement of any and all claims, disputed or otherwise, arising out of his employment relationship with the Company including claims under the Age Discrimination in Employment Act ("ADEA") which he may have, and that this Release will preclude any further or additional claims arising out of said relationship, but will not preclude any claims which might arise after this Release is executed; provided, that this Release is not intended to interfere with Executive's right to challenge that his waiver of any and all ADEA claims pursuant to this Release is a knowing and voluntary waiver, notwithstanding Executive's specific representation that he has executed this Release knowingly and voluntarily;

     b)    that, in accordance with the federal law, Executive has twenty-one (21) calendar days from the date this Release is received by him to consider and accept this Release by signing and returning it to the Company, and if so accepted, another seven (7) calendar days to revoke that acceptance should he change his mind;

     c)    that Executive has the right to consult any attorney prior to signing this Release and has been encouraged to do so by the Company; and

     d)    that Executive acknowledges that this Release is contractual and not a mere recital; and agrees that this Release shall be given full force and effect and that it shall be binding upon Executive's heirs, executors, successors, administrators and assigns.

     4.    <u>Period for Acceptance of Agreement</u>.  Executive shall have no less than twenty-one (21) calendar days from the date his employment is terminated under the Employment Agreement to consider this Release and he should execute and deliver this Release to the Company in accordance with the notice provisions of the Employment Agreement.

     5.    <u>Applicable Law</u>.  This Release shall be construed and enforced under and in accordance with the laws of the State of California.

Executive represents and certifies that he has carefully read and fully understands all of the provisions of this Release and that he is signing this Release voluntarily, of his own free will

and without duress; and that the Company, its agents, representatives or attorneys have made no representations concerning the terms or effects of this Agreement other than contained herein.

 **IN WITNESS THEREOF**, Executive has duly executed this Release on this day of

_____ 20___ .



_____          _____

**[Name of Executive]**                                    Date

**Exhibit C**

**Indemnified Personal Guaranties**

Guaranty, dated as of November 3, 2010, in favor of Celtic Capital Corporation.

Guarantee, dated as of May 17, 2006, in favor of Club Drive Partners and Oltmans Investment Company LLC dba Old Temescal Road Tenants-in-Common (Corona lease).

Guaranty contained in Premier Advantage Agreement, dated as of February 23, 2009, in favor of Konica Minolta Premier Finance.

Guaranty contained in Settlement Agreement, Guarantee and General Release, in favor of Donald Kansteiner, Margaret Kansteiner, the Donald F. Kansteiner Defined Benefit Pension Plan, and the Margaret F. Kansteiner Living Trust.

**Exhibit D**

**Liabilities**

1.      Ordinary course product warranty claims to the extent same arise (excluding any product liability claims that may be covered by insurance) for products manufactured and/or sold prior to the transaction date of up to $25,000 in excess of the $20,000 accrual on Anatomic Global, Inc.'s most recent balance sheet.

2.      Up to $75,000 of liabilities and obligations (including any future legal fees) associated with Anatomic Global, Inc.'s reporting to the Consumer Product Safety Commission regarding a potential fire safety hazard with 750 of its mattresses sold between May and October 2010.

3.      Certain legal fees incurred and unpaid to Bryan Cave LLP ("Bryan Cave") as of the transaction date, and reported to FXI at least 1 day in advance of the transaction date, in the amount of $204,340.*

4.      The excess dollar amount over $200,000 in recent trade credit from FXI to Anatomic Global, Inc. as of the transaction date in the amount of $238,852.+

5.      Amounts owed by Anatomic Global, Inc. or David Farley related to the Kansteiner settlement (approximately $98,000 as of May 18th).*

+ The noted Liability shall reduce the Earn Out Payment for the first Measurement Year and if such Earn Out Payment is not sufficient to cover same, the Liability shall reduce future Earn Out Payments until satisfied in full.

* One-third of the total dollar amount paid in connection with the noted Liability shall reduce the Earn Out Payment, if any, for the Measurement Year in which the Liability is paid; and one-third of such dollar amount shall reduce the Earn Out Payment, if any, in each of the two immediately following Measurement Years; provided that if the Earn Out Payments otherwise payable to Executive during such three Measurement Years are not sufficient to fully cover the amount of such Liability, then the Company shall be entitled to reduce the Earn Out Payments in the following Measurement Years until fully recovered.

**Exhibit E**

**Other Liabilities**

1.    Agreements between Atlanta Attachment Company and Anatomic Global, Inc. ("AGI"), dated at or about September 25, 2009.

2.    Vacation earned and accrued by employees but unpaid as of the transaction date, excluding David Farley.

3.    Salaries and wages earned by AGI employees, but unpaid as of the transaction date.

4.    Commissions earned by AGI representatives but unpaid as of the transaction date.

5.    Legal fees incurred and unpaid to Stutman, Treister & Glatt PC, WinthropCouchout, and Bryan Cave (excluding $100,000 of which shall be separately paid by FXI pursuant to instructions from David L. Farley dated the date of the transaction date) and reported to FXI at least 1 day in advance of the transaction date.

6.    Trade payables owed and outstanding as of the transaction date and reported to FXI on the transaction date (a copy of which is attached), excluding payables included in the trade payable listing that are addressed elsewhere in the Agreement.

7.    Standard Industrial/Commercial Multi-Tenant Lease – Gross, dated as of June 6, 2005, by and between, on the one hand, AGI (as successor to Anatomic Concepts, a California corporation), and on the other hand, Club Drive Partners, a California general partnership, and Oltmans Investment Company, LLC, a Delaware limited liability company, dba Old Temescal Road Tenants-in-Common, as amended.

8.    Lease Agreement, dated as of November 19, 2007, by and between WMCV Phase 3, LLC, a Delaware limited liability company, and AGI.

9.    Lease of Space in International Home Furnishings Center, dated as of January 20, 2011, by and between IHFC Properties, LLC and AGI.

10.    Equipment Lease, dated as of June 2007, by and between Puget Sound Leasing Co., Inc. and AGI, as amended (assigned to Dunhill Leasing).

11.    Master Equipment Finance Agreement #4033, dated as of November 15, 2007, by and between AGI and Vision Capital Corporation, thereafter assigned to Pacific Coast National Bank and subsequently assigned to Sunwest Bank, with all related Schedules.

12.    Premier Advantage Agreement, dated as of February 23, 2009, by and between Konica Minolta Premier Finance and AGI.

13.     Vehicle Lease Service Agreement, dated as of February 25, 2008, by and between Penske Truck Leasing Co., L.P. and AGI (as successor to Anatomic Concepts, Inc.).

14.     Master Supplier Agreement, dated as of August 14, 2009, by and between Overstock.com, Inc. and AGI.

15.     Extranet Access Agreement, Vendor Purchase Agreement, Vendor Purchase Program Agreement, Display Allowance/Upholstery, Costco Wholesale Basic Vendor Agreement (United States (2004)), and Costco Wholesale Vendor Agreement (Puerto Rico (2001)), each by and between Costco Wholesale Corporation and AGI.

16.     Agreements between Hyphen Freight Brokerage, Inc. and AGI, dated at or about March 5, 2010.

17.     Agreements between SGS SA and AGI, dated at or about May 2, 2007.

18.     Agreements between Lineage Textiles and AGI, dated at or about November 12, 2008.

19.     Agreements between Haynes Industries and AGI, dated at or about September 25, 2007.

20.     UnbeatabaleSale Vendor Set Up, by and between UnbeatableSale.com, Inc. and AGI.

21.     Agreement between Mertado Socials Deals and AGI.

22.     Employment letter, dated as of May 2011, between AGI and Ira Fishman.

23.     Employment letter, dated as of May 2011, between AGI and Rick VanderWoude.

24.     Verbal consulting agreements between AGI and each of Jeff Feltch, Darrell Nance and Neil Silverman.

25.     Manufacturing Agreement, dated June 30, 2010, by and between AGI and World Bed, Inc.

26.     Accrued sales tax obligations of AGI.

27.     Product warranty claims to the extent same arise (excluding any product liability claims to the extent to which that any such claim may be covered by AGI's then-effective insurance) for products manufactured and/or sold prior to the transaction date.

28.     Liabilities and obligations (including any future legal fees) associated with Anatomic Global, Inc.'s reporting to the Consumer Product Safety Commission regarding a potential fire safety hazard with 750 of its mattresses sold between May and October 2010.

29.     Amounts owed by Anatomic Global, Inc. or David Farley related to the Kansteiner settlement (approximately $98,000 as of May 18th).

30.     Amounts owed by Anatomic Global, Inc. to FXI, Inc. pursuant to that certain Amended and Restated Loan and Security Agreement, dated as of November 10, 2010, between Anatomic Global, Inc. and FXI, Inc. (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement") and the Debtor Documents (as defined in the Loan Agreement), excluding the Guaranty (as defined in the Loan Agreement").

**Exhibit F**

**Pending and Threatened Suits and Claims**

1. Sino Century Development Limited et al vs. Anatomic Global, Inc. and David L. Farley

2. Factory Direct, Inc. vs. Anatomic Global, Inc. et al.

3. Hyphen Freight Brokerage, Inc. v. Anatomic Global, Inc.

# Exhibit "B"

# Exhibit "B"

## SEPARATION AND RELEASE AGREEMENT

This Separation and Release Agreement ("Agreement"), dated as of March 8, 2012 (the "*Execution Date*"), is entered into by and among David L. Farley ("Executive"), Anatomic Holdings, Inc. ("Company"), and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Employment Agreement (defined below).

WHEREAS, Executive, the Company, and FXI entered into an agreement regarding Executive's employment with Company, dated May 27, 2011 (the "*Employment Agreement*");

WHEREAS, the Company terminated Executive's employment effective January 5, 2012 (the "*Termination Date*"), with such termination being treated as a termination other than for Cause for purposes of the Employment Agreement;

WHEREAS, in connection with the foregoing, the Executive, the Company, and FXI have agreed to the following in connection with Executive's termination of employment, as set forth in this Agreement; and

WHEREAS, Executive desires to provide a Release and Waiver of Claims in substantially similar form to the Release and Waiver of Claims.

NOW, THEREFORE, in consideration of the recitals, promises, and other good and valuable consideration specified herein, the receipt and sufficiency of which is hereby acknowledged, Executive, the Company, and FXI, agree as follows:

1. **EFFECTIVENESS OF AGREEMENT; TERMINATION OF EMPLOYMENT.**

    1.1    Effectiveness of Agreement.  This Agreement shall become effective upon the Execution Date; *provided, however,* that if subsequent to Executive's execution of this Agreement, Executive fails to execute, or executes and then revokes, the Executive Release (as defined below), Company shall cease to have any obligations under Section 2.1 of this Agreement.

    1.2    Termination of Employment.  Effective as of the Termination Date, the Executive's employment with the Company and its affiliates shall terminate, and Executive shall be deemed to have resigned from all positions held with Company and its affiliates, including all officer, director, and board positions.  The parties acknowledge that as of the Termination Date, Executive shall incur a "separation from service" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended ("*Section 409A*").

2. **PAYMENTS AND BENEFITS**

    2.1    Severance Payments and Benefits.  Subject to the expiration of the Revocation Period (as defined in Section 3.3 below), without revocation of the Executive Release (as defined in Section 3.1 below) by Executive and Executive's continued compliance with the Restrictive Covenants (as defined in Section 4 below), Company will pay to Executive the amounts specified in Section 5.5(b) of the Employment Agreement and provide the benefits to Executive in Section 5.5(b) of the Employment Agreement in consideration for Executive entering

into this Agreement, specifically including the Executive Release (as described in Section 3 below):

(a) <u>Earn-Out Payments</u>.  Company shall promptly and without delay pay to Executive whatever Earn-Out Payments, if any, to which he is entitled under section 5.5(b)(ii) of the Employment Agreement, for the period August 1, 2011 through December 31, 2014 (the "*Earn-Out Period*"), in accordance with the terms of such section.  During the Earn-Out Period, within 5 calendar days following each month's Board of Directors meeting of FXI Holdings, Inc., the Company and FXI shall provide to Executive a monthly profit and loss statement of the Company, in the form of <u>Exhibit A</u> attached hereto.  Company and FXI reaffirms that the procedures specified in Article 3.1(c) of the Employment Agreement shall be strictly followed.  FXI and Company also reaffirms that except as provided in Article 6.4 and 3.1(c) of the Employment Agreement with respect to the $100,000.00 advance, Company will not offset, set off or otherwise reduce any sums payable to Executive or reduce any Earn-Out Payment by any amount owed to FXI, the Company or any other FXI company or any third party or by AGI.  FXI hereby reaffirms the obligations of Anatomic Operations, Inc. ("*AOI*") under that certain Supply Agreement, dated May 27, 2011 (the "*Supply Agreement*"), by and between AOI and Company, including, but not limited to, Section 3 of the Supply Agreement.

(b) <u>Earn-Out Payment Advance</u>.  Company shall pay to Executive the lump sum of $42,000.00, representing the remaining unpaid payments on the Earn-Out Payment Advance for the period January 2012 through May 2012 under the Employment Agreement.  Such payment shall be made in the next regular payroll period following the expiration of the Revocation Period without revocation of the Executive Release.

(c) <u>Group Health Coverage</u>.  Commencing on February 1, 2012, under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Executive and his eligible dependents shall be entitled to continued participation under the Company's medical and dental plans, under the provisions of COBRA at the full COBRA rate.

2.2    <u>Other Payments and  Benefits.</u>

(a) <u>Accrued Obligations</u>.  Company shall pay or provide to Executive on the Termination Date any Base Salary or other compensation earned but not paid to Executive prior to the Termination Date, including accrued but unused vacation pay.  Company shall also pay or provide to Executive (i) any business expenses that remain unreimbursed as of the Termination Date, and (ii) any payments, benefits, or entitlements which are vested, fully and unconditionally earned or due pursuant to the Employment Agreement or any Company plan, policy, program or arrangement or other agreement.

2.3    <u>Tax Withholding</u>.  Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld in respect of any payment and/or any benefit provided for under this Agreement pursuant to any applicable law or regulation.

2.4  Other.    Notwithstanding anything contained herein, Executive is not releasing any claims with respect to (1) Executive's right to receive the Accrued/Other Obligations, (2)

Executive's rights under, and/or the provisions of, Articles V VI and VII of the Employment Agreement , (3) any breach by the Company and/or FXI of Section 2.1 (b) and/or 3.1(c) of the Employment Agreement, (4) Executive's right to be indemnified and advanced expenses pursuant to any corporate document of the Company (including without limitation the Employment Agreement) and/or FXI or applicable law or Executive's right to be covered under any applicable directors' and officers' liability insurance policies, (5) any rights as a shareholder of the Company or (6) any rights which arise after the date of this Release with respect to matters that occurred after such date  (collectively, the "*Excluded Claims*").

## 3.    RELEASE; EXECUTIVE REPRESENTATIONS

3.1    Release by Executive. For and in consideration of the payment of the amounts and the provision of the benefits described in Sections 2.1 of this Agreement, Executive hereby agrees to execute a release of all claims in the form attached as Exhibit I hereto (the "*Executive Release*").

3.2    Release by Company. For and in consideration of the obligations of Executive as set forth in this Agreement, the Company hereby agrees to execute a release of claims against Executive in the form attached as Exhibit II hereto (the "*Company Release*").

3.3    Executive's Representations and Warranties.

Executive represents that he has carefully read and fully understands the terms of this Agreement, and that Executive has been advised to consult with an attorney and has availed himself of the opportunity to consult with an attorney prior to signing this Agreement. Executive acknowledges and agrees that he is executing this Agreement willingly, voluntarily and knowingly, of his own free will, and that he has not relied on any representations, promises or agreements of any kind made to him in connection with his decision to accept the terms of this Agreement. Executive further acknowledges, understands, and agrees that as of the Termination Date his employment with Company terminated. **Executive understands that he will not receive any payments or benefits until the seven (7) day revocation period provided for under the Executive Release has passed, and then, only if he has not revoked the Executive Release (such period, the "*Revocation Period*").**

## 4.    RESTRICTIVE COVENANTS

Executive hereby acknowledges and agrees that he shall continue to be bound by the confidentiality and non-competition covenants contained in Section 4.3 of the Employment Agreement (the "*Restrictive Covenants*"). Company acknowledges and agrees that Executive's involvement with World Bed, Inc. ("*World Bed*"), a not-for-profit entity, whether as a Board member, officer, employee, or consultant, shall not constitute a breach of the non-competition covenant of Section 4.3 of the Employment Agreement.  Such involvement includes Executive's fund raising efforts and other activities involving mattress retailers on behalf of World Bed and this provision continues to apply provided that World Bed remains a not-for-profit entity.  If Company fails to make a payment as set forth in Section 2.1 of this Agreement as of the scheduled payment date for such payment, Executive's obligations under the non-competition covenant of Section 4.3 of the Employment Agreement shall terminate upon failure to make such payment.  Notwithstanding the preceding sentence, in the event that Company has proven in a civil proceeding or it has been proven in a criminal proceeding that Executive committed fraud during

the term of his employment with Company, Company shall be permitted to withhold future payments under Section 2.1 of this Agreement.

### 5.     INDEMNIFICATION, COVENANTS, & D&O LIABILITY INSURANCE

The Executive, Company and FXI hereby acknowledge and specifically agree that the provisions of Article 3.1(c), 5, 6 and 7 of the Employment Agreement will continue in full force and effect, and are incorporated herein by reference to this Agreement.  Executive specifically acknowledges and agrees that he will continue to cooperate fully with the Company and FXI with respect to the Cases referenced in Section 6.6.  Company shall reimburse Executive for any ordinary course out-of-pocket expenses incurred in connection with his management of the Cases and to the extent either of the Cases proceed to trial, Company shall pay Executive at the rate of $75 per hour for his time in attending trial and for time spent fifteen (15) days prior to trial.  Reimbursement of expenses shall be subject to Company's written policies relating to business-related expenses as in effect from time to time and any time spent on attending trial shall be billed on an invoice submitted to FXI by Executive and shall be paid by Company no later than twenty (20) days after submission of same.

### 6.     COMPLIANCE WITH SECTION 409A

Notwithstanding the other provisions hereof, this Agreement is intended to comply with the requirements of Section 409A.  Accordingly, all provisions herein, or incorporated by reference, shall be construed and interpreted to comply with Section 409A and if necessary, any such provision shall be deemed amended to comply with Section 409A and the regulations thereunder.  Further, for purposes of the limitations on nonqualified deferred compensation under Section 409A, each payment of compensation under this Agreement shall be treated as a separate payment of compensation for purposes of Section 409A.  Any amounts payable solely on account of an involuntary separation from service of Executive within the meaning of Section 409A shall be excludible from the requirements of Section 409A, either as involuntary separation pay or as short-term deferral amounts to the maximum possible extent.  Any reimbursements or in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

7. **GOVERNING LAW; RESOLUTION OF DISPUTES**

7.1    Governing Law.

This Agreement, the Executive Release, and the Company Release shall each be governed and interpreted in accordance with and enforced in all respects pursuant to the laws of the State of California, irrespective of the choice of law rules of that or any other jurisdiction that direct the application of the laws of any jurisdiction other than the State of California.

7.2    Resolution of Disputes.

The provisions of Section 7.10 of the Employment Agreement shall apply to any disputes hereunder except for those matters arising under Sections 4.1, 4.2 or 4.3 of the Employment Agreement.

8. **SEVERABILITY**

If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement or the remaining portion of a partially invalid provision, which shall remain in force, and, if possible, the provision in question shall be modified by the court so as to be rendered enforceable.

9. **CONSTRUCTION**

Each party and its counsel have reviewed this Agreement, the Executive Release, and the Company Release and have been provided the opportunity to review  such documents and accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of such documents.  Instead, the language of all parts of such documents shall be construed as a whole, and according to their fair meaning, and not strictly for or against either party.

10. **ENTIRE AGREEMENT; COUNTERPARTS**

10.1   The Agreement, the Employment Agreement, the Executive Release, and the Company Release, together set forth the entire agreement between the parties hereto and, after the expiration of the Revocation Period without revocation of the Executive Release by Executive, fully supersede any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof.

10.2   This Agreement may be executed in one or more counterparts and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

10.3   This Agreement shall be binding upon the parties and their respective assignees and successors at such time as the United States Bankruptcy Court for the Central District of California in Case No.  6:11-bk-12031-DS entitled In re David L. Farley (the "Bankruptcy Court") shall have entered a Final Order (as defined below) approving it.  "Final Order" means that on due notice, the Bankruptcy Court shall have heard a motion for approval of this Agreement as well as of any objections thereto, and shall have caused to be entered an order approving same, and the time for an appeal of such order shall have expired or if any appeals are

taken, all such appeals shall have been concluded, the time for further appeals shall have expired and the Bankruptcy Court shall have been authorized to approve this Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

ANATOMIC HOLDINGS, INC.

By:

Name:
Title:   Andrew R. Prusky
Senior Vice President, Legal

FXI, INC.

By:

Name: DONALD W. PHILLIPS
Title: EXECUTIVE VP HOME FURNISHINGS & AUTO

EXECUTIVE

David L. Farley

<u>Exhibit I</u>

EXECUTIVE RELEASE AND WAIVER OF CLAIMS

David L. Farley ("Executive") has executed this release ("Executive Release") as of the date set forth below.

WHEREAS, Executive was employed by Anatomic Holdings, Inc. and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI") pursuant to a written Employment Agreement dated May 27, 2011.

WHEREAS, Executive's employment has been terminated without cause pursuant to a Separation and Release Agreement among Executive, Anatomic Holdings, Inc. ("Company"), and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI") dated as of March 8, 2012 ("Agreement").

WHEREAS, Executive is entitled to certain payments and benefits under the Agreement subject to his execution and delivery of this Executive Release to the Company and FX, and Executive not revoking this Executive Release.

WHEREAS, the capitalized terms herein shall have the meanings set forth in the Employment Agreement dated May 27, 2011 between the parties.

NOW THEREFORE, Executive, intending to be legally bound, agrees as follows:

1.  <u>Release of Claims</u>.  In consideration for the severance payments as set forth in the Employment Agreement and other good and valuable consideration set forth therein, Executive hereby releases the Company and FXI, and its and their shareholders, directors, officers, employees, agents, attorneys, affiliates, parents, subsidiaries, predecessors, successors, assigns, and all persons acting by, through, under or in concert with any of them (but with respect to any entity, individual, agent, attorney or their affiliates, including any one acting by, through, under or in concert with any of them, only in its or his official capacity relating to the Company and not in its or his individual capacity unrelated to the Company), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, except for vested pension benefits under ERISA, and from any claims of any nature whatsoever, known or unknown, which Executive now has, claims to have, own, hold or which Executive at any time heretofore had, held, or claims to have, including without limitation, claims for: wrongful discharge; breach of covenant of good faith and fair dealing; intentional or negligent infliction of emotional distress; breach of contract or implied contract; negligence; misrepresentation; fraud; detrimental reliance; promissory estoppel; defamation; invasion of privacy; sexual harassment; breach of laws governing safety in the workplace; discrimination on the basis of sex, race, color, religion, age, national origin, status as a handicapped of disabled person or status of a non-citizen; any and all claims under the Age Discrimination in Employment Act ("ADEA"); any and all claims under Title VII of the Civil Rights Act of 1964; any and all claims under the Americans with Disabilities Act; any and all claims under state or local laws which prohibit improper discrimination; any and all claims under the California Fair Employment and

Housing Act ("FEHA") ("Released Claims"); provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Executive until after the date of this Executive Release. Notwithstanding the preceding sentence or any other provision of this Agreement, this Executive Release is not intended to interfere with Executive's right to file a charge with the Equal Employment Opportunity Commission (the "EEOC") in connection with any claim he believes he may have against the Company or FXI. However, by executing this Executive Release, Executive hereby waives the right to recover in any proceeding Executive may bring before the EEOC or any state human rights commission or in any proceeding brought by the EEOC or any state human rights commission on Executive's behalf. Nothing in this paragraph 1 is intended to release or affect Employee's rights under California Labor Code Section 2802. Notwithstanding the foregoing, Executive is not releasing any Excluded Claims (as defined in the Separation and Release Agreement).

2.   Civil Code Section 1542. Except as to those Excluded Claims defined in the Separation and Release Agreement  and any ERISA claim, Executive understands and agrees that with respect and only as to the Released Claims released in paragraph 1 above includes not only claims presently known to Executive, but also include all unknown claims, complaints, duties, obligations and causes of action relating to any matters of any kind that would otherwise come within the scope of the Released Claims as described in paragraph 1 of this Executive Release and Waiver of Claims but under no circumstances is this release to be interpreted to release the Excluded Claims defined in the Separation and Release Agreement  or ERISA claims; provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Executive until after the date of this Executive Release. Executive acknowledges that he has been advised by legal counsel and is familiar with the provisions of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Executive, being aware of said code section, agrees to expressly waive any rights Executive may have thereunder, as well as under any other statute or common law principles of similar effect as to the Released Claims (as defined above); provided, however, that this waiver shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Executive until after the date of this Executive Release..

3.   Additional Covenants and Acknowledgments. Except as to the Excluded Claims and ERISA claims, Executive further understands and agrees:

a.      That by signing this Executive Release he is voluntarily making a full and final compromise and settlement of any and all claims, disputed or otherwise, arising out of his employment relationship with the Company, including claims under the Age Discrimination in Employment Act (ADEA) which he may have, and that this Agreement will preclude any further or additional claims arising out of said relationship;

b.      That Executive has twenty-one (21) calendar days from the date this Agreement is received by him to consider and accept the Agreement by signing and returning it to the Company, and if so accepted, another seven (7) calendar days to revoke that acceptance should he change his mind;

c.      That Executive has been informed by this writing that he has the right to consult any attorney prior to signing this Agreement and has in fact been encouraged to do so by the Company; and

d.      That Executive acknowledges that this Agreement is contractual and not a mere recital; and agrees that this Agreement shall be given full force and effect and that it shall be binding upon Executive's heirs, executors, successors, administrators and assigns.

4.      Acceptance of Agreement.  Executive should execute and deliver this Executive Release by registered or certified mail, or by overnight delivery, to:

Andrew R Prusky – Senior Vice President, Legal
FXI
Rose Tree Corporate Center II
Media, PA 19063-2076

5.      Applicable Law. This Executive Release shall be construed and enforced under and in accordance with the laws of the State of California.

Executive represents and certifies that he has carefully read and fully understands all of the provisions of this Executive Release and that he is signing this Executive Release voluntarily, of his own free will and without duress; and that neither the Company nor FXI, its agents, representatives or attorneys have made any representations concerning the terms or effects of this Agreement other than contained herein.

**IN WITNESS THEREOF**, Executive has duly executed this Executive Release on this 8th day of March 2012.

David L. Farley

Exhibit II

## RELEASE AND WAIVER OF CLAIMS

Anatomic Holdings, Inc. ("Company") has executed this release ("Company Release") as of the date set forth below.

WHEREAS, David Farley's ("Executive") employment has been terminated without cause pursuant to a Separation and Release Agreement among Executive, Anatomic Holdings, Inc. ("Company"), and FXI, Inc. (formerly known as Foamex Innovations Operating Company) d/b/a FXI ("FXI") dated as of March 8, 2012 ("Agreement").

WHEREAS, Executive has agreed to certain obligations under the Agreement, partially in consideration for the execution by Company of this Company Release;

THEREFORE, Company agrees as follows:

1.      Release of Claims.  In consideration for Executive's obligations under the Agreement and other good and valuable consideration set forth herein, Company and its parent, affiliates, and subsidiaries releases Executive from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, and from any claims of any nature whatsoever, known or unknown, which Company now has, claims to have, own, hold or which Company at any time heretofore had, held, or claims to have, arising out of Executive's employment with Company; provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Company until after the date of this Company Release.

2.      Civil Code Section 1542.  Company understands and agrees that the claims released in paragraph 1 above include not only claims presently known to Company, but also include all unknown claims, complaints, duties, obligations and causes of action relating to any matters of any kind that would otherwise come within the scope of the released claims as described in paragraph 1; provided, however, that this release shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Company until after the date of this Company Release.  Company acknowledges that it has been advised by legal counsel and is familiar with the provisions of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Company, being aware of said code section, agrees to expressly waive any rights Company may have thereunder, as well as under any other statute or common law principles of similar effect; provided, however, that this waiver shall not apply to any claims based on fraud where the factual basis for such claim is not discovered by Company until after the date of this Company Release.

     3.    Acceptance of Agreement. Company should execute and deliver this Company Release by registered or certified mail, or by overnight delivery, to:

     David L. Farley
     2891 Venezia Terrace
     Chino Hills, CA 91709

4.    Applicable Law. This Company Release shall be construed and enforced under and in accordance with the laws of the Commonwealth of Pennsylvania.

**IN WITNESS THEREOF**, Company has duly executed this Company Release on this 8th day of March 2012.

     ANATOMIC HOLDINGS, INC.

     By:
     Name: Andrew R. Prusky
     Title: Senior Vice President, Legal

FXI, INC.

     By:
     Name: DONALD W. PHILLIPS
     Title: EXECUTIVE VP HOME FURNISHINGS & AMEC